Case No. 14-1642
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

**Richard M. Smith, et al.,** Plaintiffs-Appellants

**State Of Nebraska,** Intervenor Plaintiff-Appellant

**vs.**

**Mitch Parker, et al.,** Defendants-Appellees

**The United States,** Intervenor Defendant-Appellee

Appeal from U.S. District Court, District of Nebraska, Honorable Richard G. Kopf
(4:07-CV-03101)

**BRIEF OF APPELLEES MITCH PARKER, IN HIS OFFICIAL CAPACITY
AS CHAIRMAN OF THE OMAHA TRIBAL COUNCIL; BARRY
WEBSTER, IN HIS OFFICIAL CAPACITY AS VICE-CHAIRMAN OF
THE OMAHA TRIBAL COUNCIL; AMEN SHERIDAN, IN HIS OFFICIAL
CAPACITY AS TREASURER OF THE OMAHA TRIBAL COUNCIL;
RODNEY MORRIS, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
THE OMAHA TRIBAL COUNCIL; ORVILLE CAYOU, IN HIS OFFICIAL
CAPACITY AS MEMBER OF THE OMAHA TRIBAL COUNCIL;
ELEANOR BAXTER, IN HER OFFICIAL CAPACITY AS MEMBER OF
THE OMAHA TRIBAL COUNCIL; ANSLEY GRIFFIN, IN HIS OFFICIAL
CAPACITY AS MEMBER OF THE OMAHA TRIBAL COUNCIL AND AS
THE OMAHA TRIBE'S DIRECTOR OF LIQUOR CONTROL**

Nora M. Kane
Patricia A. Zieg
Stinson Leonard Street LLP
1299 Farnam St., Suite 1500
Omaha, NE 68102
Phone: (402) 342-1700
Fax: (402) 930-1701
nora.kane@stinsonleonard.com
patricia.zieg@stinsonleonard.com
Attorneys for Defendants-Appellees

Mark J. Peterson
Peterson Law Office, LLC
5201 Chicago Street
Omaha, NE 68132
Phone: (402) 517-2161
mark.peterson.omaha@gmail.com
Attorneys for Defendants-Appellees

July 7, 2014

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. i

TABLE OF AUTHORITIES .......................................................................... iii

INTRODUCTION ........................................................................................ 1

UNDISPUTED FACTS ................................................................................ 1

JURISDICTIONAL STATEMENT ............................................................... 1

STATEMENT OF THE ISSUE .................................................................... 1

STATEMENT OF THE CASE ..................................................................... 2

   I.    Parties and Background of Lawsuit ............................................. 2

SUMMARY OF ARGUMENT .................................................................... 5

ARGUMENT .............................................................................................. 7

   I.    The 1882 Act Did Not Diminish the Omaha Indian Reservation ............. 7

      A.    First Prong: The Act of 1882 does not include the hallmark language of diminishment ................................................................. 7

          1.    Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351 (1962) ................................. 9

          2.    Mattz v. Arnett, 412 U.S. 481 (1973) ......................... 11

          3.    DeCoteau v. District County Court for the Tenth Judicial District, 420 U.S. 425 (1975) .............................. 13

          4.    Rosebud Sioux Tribe v. Kneip, 430 U.S. 584 (1977) .............. 14

          5.    Solem v. Bartlett, 465 U.S. 463 (1984) ....................... 15

          6.    Hagen v. Utah, 510 U.S. 399 (1994) ......................... 16

          7.    South Dakota v. Yankton Sioux Tribe, 522 U.S. 329 (1998) ................................................................. 17

          8.    Summary of cases ................................................ 17

Appellate Case: 14-1642    Page: 2    Date Filed: 07/08/2014 Entry ID: 4172664

9.      Pender's Argument that the Act of 1882 be scrutinized differently than post-Dawes Act legislation is without merit. .......................................................................21

B.    The Second Prong: There is no clear and unambiguous evidence of a widely-held contemporaneous understanding that Congress intended to alter the boundaries of a reservation.......25

1.      Treaties of 1854 & 1865 ...........................................26

2.      The 1872 Act...........................................................27

3.      Legislative history of the 1882 Act............................28

C.    The Third Prong: There is no clear and unambiguous evidence of subsequent conduct or demographic history that supports diminishment.....................................................31

1.      Allotments .................................................................32

2.      Post-sale activity ......................................................33

3.      Demographic history within Pender ........................35

4.      Thurston County boundaries....................................36

5.      Historical summary ................................................37

6.      Retrocession ...........................................................37

7.      Opinion of the Office of the Solicitor, U.S. Department of the Interior ........................................38

8.      Other significant activity evidences that the Omaha Reservation borders remain unchanged since 1865.................38

9.      Pender's Parade of Horribles does not withstand scrutiny........40

II.    State's Contradictory Positions & Admissions: Challenge to the Agreement for the Collection and Dissemination of Motor Fuel Taxes.............................................................................42

CONCLUSION ........................................................................43

Appellate Case: 14-1642    Page: 3    Date Filed: 07/08/2014 Entry ID: 4172664

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*DeCoteau v. District Court for the Tenth Judicial Dist.,*
420 U.S. 425 (1975)......................................................................*passim*

*Dorothy J. v. Little Rock School Dist.,*
7 F.3d 729 (8th Cir. 1993) ...........................................................28

*Duncan Energy Co. v. Three Affiliated Tribes,*
27 F.3d 1294 (8th Cir. 1994) ......................................................2, 27

*Estes v. United States*,
225 F. 980 (8th Cir. 1915) ...........................................................20

*Hagen v. Utah,*
510 U.S. 399 (1994).......................................................7, 16, 18, 22

*Hallowell v. United States,*
221 U.S. 317 (1911).......................................................................36

*Lone Wolf v. Hitchcock,*
187 U.S. 553 (1903).........................................................................7

*Mattz v. Arnett,*
412 U.S. 481 (1973)...............................................................*passim*

*Osage Nation v. Irby,*
597 F.3d 1117 (10th Cir. 2010) .................................................23, 24

*Rosebud Sioux Tribe v. Kneip,*
*430 U.S. 584 (1977)*..............................................................*passim*

*Seymour v. Superintendent of Washington State Pen.,*
368 U.S. 351 (1962)................................................................*passim*

*Solem v. Bartlett,*
465 U.S. 463 (1984)................................................................*passim*

*South Dakota v. Yankton Sioux Tribe,*
522 U.S. 329 (1998).......................................................7, 17, 18, 26

iii

*United States v. Celestine,*
   215 U.S. 278 (1909)...........................................................................7

*Wisconsin v. Stockbridge-Munsee Community,*
   554 F.3d 657 (7th Cir. 2009) ...............................................23, 24, 25

**Statutes**

18 U.S.C. § 1161 ..............................................................................3

28 U.S.C. § 1291 ..............................................................................1

1872 Act, ch. 435, 17 Stat. 391........................................................27

Act of 1872........................................................................................27

Act of 1882..................................................................................*passim*

Act of August 7, 1882, ch. 434, 22 Stat. 341 ...................................2

Compiled States of Nebraska 1889 chapter 17, § 75b.......................36

Compiled Statutes of Nebraska 1922, chapter 13, § 804.................36

Dawes Act ..........................................................................................21

Indian Reorganization Act of 1934. (App. 129 at ¶ 15) ...............3

Appellate Case: 14-1642    Page: 5    Date Filed: 07/08/2014 Entry ID: 4172664

## INTRODUCTION

An Act of Congress diminishes the boundaries of an Indian reservation only if the statutory language is clear, and the intent to diminish is plain and unambiguous. Secondary consideration is given to events surrounding the passage of a Surplus Land Act to determine that Congress intended to alter the boundaries of a reservation. Finally, the subsequent jurisdictional and demographic history of the region opened for settlement may be considered.

Both the Omaha Tribal Court and the United States District Court for the District of Nebraska applied this three-part test and both concluded that Congress did not diminish the Omaha Reservation. The Omaha Tribe respectfully submits that this Court should reach the same conclusion.

## UNDISPUTED FACTS

The parties submitted a Joint Stipulation of Facts. (App. 127-160).

## JURISDICTIONAL STATEMENT

The Omaha Tribe agrees with the Appellants' jurisdictional statement pertaining to the District Court. This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291 because it is an appeal from a final decision of the District Court which disposed of all parties' claims.

## STATEMENT OF THE ISSUE

An Indian reservation is diminished by a Surplus Land Act only if the Act contains clear language of an intent to eliminate or change the boundaries, or if

1

there is otherwise unequivocal evidence of Congressional intent to alter the boundaries of a reservation. After conducting thorough and exhaustive analyses, the Tribal Court and the District Court both concluded that the Act of 1882 did not diminish the Omaha Indian Reservation. Should this Court likewise apply well-settled United States Supreme Court precedent and conclude that Congress did not intend to diminish the Omaha Indian Reservation? Yes. The District Court's Opinion should be affirmed in its entirety.

*Solem v. Bartlett,* 465 U.S. 463 (1984)

*Mattz v. Arnett,* 412 U.S. 481 (1973)

*Seymour v. Superintendent of Washington State Pen.,* 368 U.S. 351 (1962)

*Duncan Energy Co. v. Three Affiliated Tribes,* 27 F.3d 1294 (8th Cir. 1994)

Act of August 7, 1882, ch. 434, 22 Stat. 341

## STATEMENT OF THE CASE

I. <u>**Parties and Background of Lawsuit**</u>

Appellants include the Village of Pender, a political subdivision of the State of Nebraska located in Thurston County. The remaining Appellants are residents of Thurston County, and owners of or agents for establishments engaged in the sale of alcoholic beverages in or near Pender. (App. 128-129 at ¶¶ 1-10). The Appellants will be collectively referred to as "Pender."

2

The Omaha Tribe of Nebraska is a federally recognized Indian Tribe organized and chartered under the Indian Reorganization Act of 1934. (App. 129 at ¶ 15) (citing the Indian Entities Recognized and Eligible to Receive Services from U.S. Bureau of Indian Fairs Notice, 75 Fed. Reg. 60810 (Oct. 1, 2010)). All named Appellees are or were at all relevant times members or officials of the Omaha Tribal Council. (App. 129 at ¶¶ 15-16). The Appellees are collectively referred to as the "Omaha Tribe."

Pender sued the Omaha Tribe for injunctive and declaratory relief from the Omaha Tribe's attempts to enforce its Beverage Control Ordinance relating to the Plaintiffs' sale of alcohol in and upon Omaha Reservation land.[1] (App. 129-130 at ¶¶ 17-26). Pender argues that they are not subject to the Omaha Tribe's jurisdiction because, they claim, they are not located on a federally recognized Indian reservation or in "Indian country."

On October 4, 2007, the District Court stayed the original proceeding in order for Pender to exhaust any potential remedies available in the Omaha Tribal Court. (ECF 53). On January 7, 2008, Pender filed an action in the Omaha Tribal Court, seeking a judgment declaring that the Village of Pender is not within the boundaries of the Omaha Reservation, and an injunction prohibiting the enforcement of the Beverage Control Ordinance in Pender. (App. 132 at ¶ 29).

---

[1] There is no dispute that 18 U.S.C. § 1161 permits the Omaha Tribe to regulate liquor sales on its Reservation land. Appellants' Add. 2 at n.2; Pender Br. at 4.

3

Recognizing that an intensive historical analysis was required to determine the ultimate issue of whether an Act of Congress diminished the original boundaries of the Omaha Indian Reservation, the Omaha Tribe retained R. David Edmunds, Ph.D., Watson Professor of American History at the University of Texas at Dallas, as its expert witness. (App. 132 at ¶ 31).

On February 4, 2013, the Omaha Tribal Court held that the 1882 Act did not diminish the boundaries of the Omaha Indian Reservation. (App. 79-122, Tribal Court Memorandum Opinion & Order & App. 126, Tribal Court Judgment). The parties then returned to the District Court.

The United States Department of Justice ("DOJ") participated as *amicus curiae* in the Tribal Court proceeding. Both the DOJ and the State of Nebraska were granted Intervenor status by the District Court.

The parties filed cross-motions for summary judgment on the sole issue of whether the Omaha Reservation was diminished by the 1882 Act. The District Court set forth the parties' Statement of Undisputed Facts (Pender's Add. at 4-31), and then articulated the United States Supreme Court's three-prong test for determining whether an Indian reservation has been diminished:

> To determine whether a reservation has been diminished, we examine three factors: the statutory language, the historical context, and the population that settled the land. Of the three factors, the statutory language is the most probative. Throughout the inquiry, ambiguities are to be resolved in favor of the Indians, and diminishment should not be found lightly.

4

(Pender's Add. at 32) (quoting *Duncan Energy Co. v. Three Affiliated Tribes,* 27 F.3d 1294 (8th Cir. 1994)). The District Court correctly noted that the most probative evidence of diminishment is the statutory language used to open Indian lands; however, the courts will also consider "the historical context surrounding the passage of the surplus land Acts, and, to a lesser extent, the subsequent treatment of the area in question and the pattern of settlement there." *Id.* at 32-33 (quoting *South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329, 344 (1998)).

After a thorough and comprehensive analysis of the Act of 1882, the legislative history, the historical context, the stipulated facts, and the parties' arguments, the District Court concluded that the Omaha Reservation was not diminished by the Act of 1882, and granted summary judgment in favor of the Omaha Tribe.

## SUMMARY OF ARGUMENT

The Act of 1882 is devoid of the hallmark language of diminishment. The Act does not provide for cession, relinquishment, conveyance, or surrender of all rights, title, or interest to the Omaha Tribe's land in exchange for a specific sum of money, does not restore lands to the public domain, and does not require the Tribe to vacate their Reservation land. In fact, the Act expressly identifies property both east and west of the abandoned railroad right-of-way as part of the Reservation.

Appellate Case: 14-1642   Page: 10   Date Filed: 07/08/2014 Entry ID: 4172664

Pender concedes that this most probative factor—the statutory language—is directly inapposite to their position.

The secondary consideration prong of the analysis likewise fails to evince that the 1882 Act impacts the boundaries of the Omaha Reservation, much less the requisite "unequivocal" evidence necessary to alter the boundaries of the Reservation.

Finally, the third prong, considering the subsequent jurisdictional and demographic history, presents a mixed record which fails to reveal a consistent or dominant approach to the territory at issue, is of little interpretive value, carries little force, and cannot be considered dispositive of the question whether Congress intended to diminish the Omaha Reservation in the Act of 1882. But, the Omaha Tribe submits that many of the more compelling facts pertaining to the subsequent history of the land in dispute weigh in favor of non-diminishment.

Continued recognition of the Omaha Reservation as extending west of the railroad right-of-way will simply allow the Federal, State, and County authorities to maintain a peaceful co-existence and allow the continued sharing of tax revenue generated on the Omaha Reservation.

Appellate Case: 14-1642    Page: 11    Date Filed: 07/08/2014 Entry ID: 4172664

# ARGUMENT[2]

## I.    The 1882 Act Did Not Diminish the Omaha Indian Reservation

### A.    *First Prong: The Act of 1882 does not include the hallmark language of diminishment*

The first prong begins with an absolute:  Only Congress can diminish an Indian reservation.  *Yankton Sioux Tribe,* 522 U.S. at 343 ("Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights. Accordingly, only Congress can alter the terms of an Indian treaty by diminishing a reservation, and its intent to do so must be `clear and plain'" (citations omitted)); *accord United States v. Celestine,* 215 U.S. 278, 285 (1909).

The most probative evidence of the intent of Congress is the statutory language employed by the Congress in opening Indian lands for non-Indian settlement."  *Hagen v. Utah,* 510 U.S. 399, 411 (1994) (citations omitted). Congressional intent to diminish a reservation must be "clear and plain."  *Yankton Sioux,* 522 U.S. at 343 (quoting *United States v. Dion,* 476 U.S. 734, 738-39 (1986)).  "[I]n decisions of [the United States Supreme Court], the Indian right of occupancy of tribal lands, whether declared in a treaty or otherwise created, has been stated to be sacred, or, as sometimes expressed, as sacred as the fee of the United States in the same lands."  *Lone Wolf v. Hitchcock,* 187 U.S. 553, 565-66 (1903) (citations omitted).

---

[2] The parties agree that the District Court's decision is subject to this Court's *de novo* review.

Appellate Case: 14-1642    Page: 12    Date Filed: 07/08/2014 Entry ID: 4172664

The Supreme Court requires the application of certain canons of statutory construction to the analysis under the first prong. First, the Act must "clearly evince" the intent of Congress to change the reservation boundaries. *Solem v. Bartlett,* 465 U.S. 463, 470 (1984). Second, any ambiguity in the language of the Act must be construed broadly in favor of the Indian Tribe, due to vast inequities in the bargaining power of the government over the tribes and of the trust responsibility of the United States over the tribes. *DeCoteau v. District Court for the Tenth Judicial Dist.,* 420 U.S. 425, 447 (1975).

The language of the 1882 Act does not provide for relinquishment, conveyance, or surrender of all rights, title, or interest to the Omaha Reservation in exchange for a specific sum of money. The Act does not restore lands to the public domain, or require the Omaha Tribe to vacate its Reservation land. Rather, the Act states that the land west of the right-of-way could "be surveyed, if necessary, and sold" and, after survey and "appraisement," could be proclaimed by the Secretary of the Interior as "open for settlement." Proceeds of the sales were to be "placed to the credit of said Indians in the Treasury of the United States," and income was to "be annually expended for the benefit of said Indians." Further, Article 8 of the 1882 Act allows "Indians [to] select the land which shall be allotted to them in severalty *in any part of said reservation either east or west of said right of way*,"

Appellate Case: 14-1642    Page: 13    Date Filed: 07/08/2014 Entry ID: 4172664

suggesting that Congress intended the land west of the right-of-way to remain part of the Omaha Reservation. Appellants' Add. at 56.

Pender has always conceded that the most probative factor to be examined in a diminishment inquiry—statutory language—is inapposite to their position.[3] Notwithstanding this critical concession, the Omaha Tribal Court and the District Court both conducted appropriate analyses under United States Supreme Court and Eighth Circuit precedent.

The basic tenet of the law of diminishment remains unchanged throughout this controlling precedent—only Congress can diminish a reservation through clear and plain edict.

    1.    <u>Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351 (1962)</u>

In *Seymour v. Superintendent of Washington State Penitentiary,* 368 U.S. 351 (1962), the Supreme Court reiterated the tenet that the boundaries of a reservation remain the same until Congress acts to change them. *Id.* at 359. The Court also provided guidance as to when actions of Congress can be construed as diminishing a reservation. According to the Court, for diminishment to occur, the Congressional action must effect a complete cession of sovereignty and the return of the land to the public domain.

---

[3] The District Court noted Pender's concession in its memorandum opinion at Pender's Add. at 34. Pender reiterated this concession in its Appellant's Brief to this Court at CM/ECF p. 51

9

The Court's analysis began with the explicit language of the 1906 Act, which provided for the sale of mineral lands and opened up certain lands to homesteading.  Significant to the analysis was the conspicuous absence of any language "vacating" the land at issue or "restoring" it to the "public domain."  *Id.* at 355.

The 1882 Act at issue in this case is also bereft of such language.

The distribution of the proceeds from the sale of the pertinent land (the South Half of the reservation) was also important to the *Seymour* Court.  When the North Half of the reservation was diminished, Congress was given power to "appropriate the net proceeds from the sale and disposition of lands in the North Half of the original reservation for the general public use."  *Id.* at 355-56.

 In contrast, the Act pertaining to the South Half provided that the funds were to be "deposited in the Treasury of the United States to the credit of the Colville and confederated tribes of Indians belonging and having tribal rights on the Colville Indian Reservation in the State of Washington."  *Id.*  Importantly, the proceeds from the sale of the Omaha lands were similarly deposited in the Treasury for the benefit of the Omaha Tribe.  (Appellant's Add. at 56, § 3).

The State of Washington argued that because "the particular parcel of land upon which the underlying crime committed is held under a patent in fee by a non-Indian," the reservation would be "diminished by the actual purchase of land

10

within it by non-Indians because land owned in fee by non-Indians cannot be said to be reserved for Indians." *Id.* at 357.

The Court squarely rejected this argument, concluding that "[t]he Act did no more than open the way for non-Indian settlers to own land on the reservation in a manner in which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards." *Id.* at 356.

Here, the District Court properly reached this same conclusion because the 1882 Act did nothing more than open the way for non-Indian settlers to own land on the Reservation in a manner in which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards. Mem. Op., Pender Add. at 37.

2.    Mattz v. Arnett, 412 U.S. 481 (1973)

In *Mattz v. Arnett*, 412 U.S. 481 (1973), the question before the Court was whether the Klamath River Indian Reservation was diminished by an 1892 Act of Congress. The Court held that the 1892 Act did *not* alter the boundaries of the reservation.

As in *Seymour*, the 1892 Act in *Mattz* did not provide for a sum certain payment. Instead, the proceeds were to be collected by the Government to be distributed to the benefit of its wards. The absence of the "sum certain" language weighed in favor of a finding of non-diminishment. Again, there was no language

11

in the Act requiring the Indians to vacate the land, no language returning the land to the public domain, and no language terminating the reservation.

In addition, the provisions for allotments to tribal members caused the *Mattz* Court to specifically note that "allotment under the 1892 Act is completely consistent with continued reservation status." *Id.* at 497. In fact, the inclusion of allotments was of monumental importance to the Court: "The presence of allotment provisions in the 1892 Act cannot be interpreted to mean that the reservation was to be terminated." *Id.* at 504.

The foregoing factors, together with the subsequent treatment of the land as reservation by the Department of the Interior and Congress, led the Court to conclude that Congress did not intend to change the boundaries of the reservation. The *Mattz* Court reiterated that "[a] congressional determination to terminate must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." *Id.* at 505.

The Court further noted that if Congress wanted to terminate the reservation, it "was fully aware of the means by which termination could be effected." *Id.* at 504. The Court buttressed this statement by referencing specific examples of explicit diminishment:

> Congress has used clear language of express termination when that result is desired. See, for example, 15 Stat. 221 (1868) ("the Smith River reservation is hereby discontinued"); 27 Stat. 63 (1892) (adopted just two weeks after the 1892 Act with which this case is

12

concerned, providing that the North Half of the Colville Indian Reservation, "the same being a portion of the Colville Indian Reservation. . . be, and is hereby, vacated and restored to the public domain"), and Seymour v. Superintendent, 368 U.S. at 354; 33 Stat. 218 (1904) ("the reservation lines of the said Ponca and Otoe and Missouria Indian reservations be, and the same are hereby, abolished").

*Id.* at n.22. In light of the absence of such language in the 1892 Act, the Court held, "[c]lear termination language was not employed in the 1892 Act. This being so, we are not inclined to infer an intent to terminate the reservation." *Id.* at 504.

Likewise, in this case, the 1882 Act contains no language requiring the Omaha Tribe to vacate the land, no language returning the land to the public domain, and no language terminating the Reservation. There is no payment of a sum certain. Consistent with *Mattz,* the allowance of allotments both east and west of the railroad right-of-way in the Act of 1882 clearly evinces a Congressional intent that the boundaries of the Omaha Reservation were to remain intact.

3. <u>DeCoteau v. District County Court for the Tenth Judicial District, 420 U.S. 425 (1975)</u>

In *DeCoteau v. District County Court for the Tenth Judicial District,* 420 U.S. 425 (1975), the Court addressed whether the boundaries of the South Dakota Lake Traverse Reservation were altered by an 1891 Act of Congress. The Court concluded that the reservation was terminated and restored to the public domain.

*DeCoteau* held that the 1891 Act included a straightforward cession of lands to the United States Government for a sum certain. Specifically, in *DeCoteau,* the

13

tribe agreed to "hereby cede, sell, relinquish, and convey . . . for a sum certain." *Id.* at 445. The "sum certain" language is important (*id.*) and distinct from the collection of proceeds (uncertain in amount) for future disbursement for the benefit of the tribe by the government, present in both *Seymour* and *Mattz* (and this case).

Finally, the *DeCoteau* Court held that the language of diminishment was nearly indistinguishable from that used in the other "sum-certain, cession agreements ratified by Congress in the same 1891 Act." *Id.* (providing examples).

But not one of the examples set forth by *DeCoteau* of "sum-certain cession agreements" in the 1891 Act appear anywhere in the 1882 Act. Rather, the terms and phrases that Congress employed in the 1882 Act are similar, if not identical, to the language found in the *non-diminishment* cases. *See Seymour, supra; Mattz,* 412 U.S. at 504 (holding that when such language is not employed, the Court will not be "inclined to infer an intent to terminate the reservation.") and *Solem, infra*.

### 4. Rosebud Sioux Tribe v. Kneip, 430 U.S. 584 (1977)

In *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584 (1977), the Supreme Court held that certain Acts of Congress clearly demonstrated an intent to diminish the boundaries of the Rosebud Sioux Reservation. *See id.* at 597 (finding that the Rosebud Sioux Tribe ceded, surrendered, granted and conveyed all their rights to the land at issue, noting that as in *DeCoteau,* 420 U.S. at 445, this language is "precisely suited" to disestablishment). The Court also relied upon a presidential

14

proclamation which reflected Congressional intent to diminish in no uncertain terms. *Id.* at 602.

Again, the pivotal language of cession appears nowhere within the Act of 1882 at issue in this case. Thus, there is no support in *Rosebud Sioux* for a finding of diminishment of the Omaha Reservation.

5. Solem v. Bartlett, 465 U.S. 463 (1984)

In *Solem v. Bartlett*, 465 U.S. 463 (1984), the Supreme Court held that the Cheyenne River Reservation was not diminished by the Cheyenne River Act. *Solem* is a unanimous opinion which discusses *Seymour, Mattz, DeCoteau,* and *Rosebud*, identifies the guidelines relied upon in each case, and assigns hierarchal weight to each of them. *Solem* provides a useful framework "for distinguishing those surplus land acts that diminished reservations from those that simply offered non-Indians the opportunity to purchase land within established reservation boundaries." 465 U.S. at 470.

Examining the "most probative evidence," the *Solem* Court found a sharp, and outcome-determinative, difference between the "cede, sell, relinquish and convey" language of *DeCoteau* and the "sell and dispose" language of the Cheyenne River Act. *Id.* at 463. Also important was the contrast between the sales of land for a "sum certain" as in *DeCoteau* versus the Cheyenne River Act's

15

creation of an account where sale proceeds are deposited for the benefit of the Indians. *Id.* at 473.

The language of the 1882 Act is substantially similar to the language at issue in the *Solem* case, *i.e.,* neither Act provided the hallmark language of diminishment. Accordingly, the same conclusion should be reached with regard to the 1882 Act—the Act is devoid of the key language of diminishment, and the Omaha Reservation was not diminished by its enactment.

6.     Hagen v. Utah, 510 U.S. 399 (1994)

In *Hagen v. Utah*, 510 U.S. 399 (1994), the Court held that Congress intended to diminish the Uintah Indian Reservation. The Court relied upon the hierarchical framework of *Solem*, with a renewed emphasis that statutes should be liberally construed, in the broadest possible scope, in favor of Indians, with ambiguous provisions interpreted in their favor. *Id.* at 411.

Essential to the *Hagen* Court's conclusion of diminishment was the Act's provision that the land in question would be "restored to the public domain." *Id.* at 412. Such language, along with the contemporaneous events surrounding its passage, and the subsequent demographics unambiguously evinced a Congressional intent to diminish the Uintah reservation.

The 1882 Act involving the Omaha Reservation did not "restore land to the public domain" and is thus distinct from *Hagen*. Moreover, the context of the

16

passage of the 1882 Act, as well as the contemporaneous events surrounding its enactment, and the subsequent demographic results as discussed, *infra*, evinced a Congressional intent *not* to diminish the Omaha Reservation.

7.  <u>South Dakota v. Yankton Sioux Tribe, 522 U.S. 329 (1998)</u>

In *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998), the Supreme Court determined that an 1894 Act diminished the Yankton Sioux Reservation. The Court concluded that the Act's language and the circumstances surrounding its passage evinced a Congressional intent to diminish the reservation. *Id.* at 333.

The statutory language in *Yankton Sioux* mirrored that of *DeCoteau* with cession language coupled with a fixed payment component. The Court thus easily concluded in favor of diminishment. However, the 1882 Act is devoid of either cession language or a fixed payment component.

8.  <u>Summary of cases</u>

Following is a case-by-case chart, including the language that the Supreme Court has found to be outcome determinative of diminishment, (*i.e.*, language of absolute cession, return of the land to the public domain, and payment of a sum certain).

17

| CASES FINDING DIMINISHMENT | | |
|---|---|---|
| Case | Language of Diminishment | Payment Provisions |
| *DeCoteau* | "hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest[.]"<br><br>Congressional supporters repeatedly stated the land would be restored to the "public domain" | Sum certain |
| *Rosebud Sioux* | "hereby cede, surrender, grant and convey to the United States all their claim, right, title and interest." | |
| *Hagen* | Restoration of land to the public domain. | |
| *Yankton Sioux* | "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation" | fixed payment of $600,000 |

There is no dispute between the parties that the Act of 1882 does not include the hallmark language of cession. There are absolutely no meaningful similarities between the cases finding diminishment and the Act of 1882.

However, there are overarching similarities between the Supreme Court cases finding *no* diminishment and the 1882 Act, as illustrated below:

| CASES CONCLUDING NO DIMINISHMENT | | |
|---|---|---|
| Case | Absence of Language of Diminishment | Payment Provisions |
| *Seymour* | Absence of language expressly vacating land and absence of language restoring land to public domain | Payment to the Department of Treasury for the credit of the tribe |
| *Mattz* | Absence of language of vacating or returning land; absence of language requiring termination

*granting of allotments key to finding of non-diminishment | Collected and distributed by the Government for the benefit of its wards |
| *Solem* | No language of cession, merely permission to "sell and dispose" | Proceeds to be paid into accounts to be created for tribal members |

In sum, this case is aligned with the teachings of *Seymour, Mattz,* and *Solem* under the first prong based upon the following:

- The 1882 Act did not provide for a relinquishment of title to the land in exchange for a specific sum of money.

- The 1882 Act did not provide for the total surrender of all tribal rights on the opened lands.

- The 1882 Act did not require that the Omaha Tribal members vacate any part of the Reservation.

- The 1882 Act did not restore the opened lands to the public domain.

- The 1882 Act did not prohibit access by the Omaha Tribe to the opened lands following its passage.

Appellate Case: 14-1642    Page: 24    Date Filed: 07/08/2014 Entry ID: 4172664

- The proceeds of the sales made pursuant to the 1882 Act were to be "placed on the credit of said Indians in the Treasury of the United States, and shall bear interest[.]" (Appellants' Add. at 56, § 3).

The 1882 Act provision allowing for allotments to be given to the Omaha Indians on both east and west of the railroad right-of-way buttresses a finding of non-diminishment:

> That said Indians or any part of them may, if they shall so elect, select the land which shall be allotted to them in severalty in any part of said reservation either east or west of said right of way mentioned in the first section of this act.

(Appellants' Add. at 56, § 8).

First and foremost, "allotments," by definition, could only be made on Indian land, that is, land within a reservation. *Estes v. United States*, 225 F. 980, 981 (8th Cir. 1915). The provision in the 1882 Act allowing allotments on land west of the right-of-way logically mandates a conclusion that the land west would remain within the Omaha Reservation.

Per the Supreme Court, allotment under an Act "is completely consistent with continued reservation status" and the "presence of allotment provisions" in the 1892 Act reviewed in *Mattz* "cannot be interpreted to mean that the reservation was to be terminated." *Mattz*, 412 U.S. at 497 & 504.

20

9.    Pender's Argument that the Act of 1882 be scrutinized differently than post-Dawes Act legislation is without merit.

Pender asserts, without rational explanation, that "it is vital to distinguish both the 1872 and 1882 Acts 'from a run-of-the-mill allotment act'" and that "[the Acts] here predate and differ from the 1887 Dawes Act and later surplus allotment acts in a meaningful way." (Pender Brief at 47, 48).  Pender fails to explain in what "meaningful way" this Court's analysis should differ or depart from United States Supreme Court precedent on reservation diminishment. This argument is based upon several faulty premises.

First, Pender claims that the Dawes Act differed from the earlier legislation because, "[u]nder the Dawes Act, individual parcels of land were allotted to tribe members with the remaining parcels declared surplus and opened for settlement by, and sale to, non-Indians."   (Pender Br. at 39).    This "distinction" is nonsensical, because Pender ignores the fact that the Act of 1882 expressly provided for Omaha Tribe members to be given first option for allotments amid the section of their Reservation to be offered for sale, with no accompanying language of cession for unalloted lands.  (Appellants' Add. at 56, § 8).  Furthermore, the concept of allotments indisputably existed well-prior to the 1887 enactment of the Dawes Act.  *See, e.g., Mattz,* 412 U.S. at 491 ("In 1883 the Secretary of the Interior directed that allotments of land be made to the Indians on the reservation.").

Appellate Case: 14-1642     Page: 26     Date Filed: 07/08/2014 Entry ID: 4172664

Pender also claims that the Supreme Court found diminishment in *Hagen* and *Rosebud Sioux* despite the Acts allowing for Indians to take allotments "before return of the unallotted land to the public domain for sale and settlement." (Pender Brief at 50). This argument fails to acknowledge that the Acts at issue in *Hagen* and *Rosebud Sioux* contained explicit and unequivocal language of diminishment not present in the Act of 1882. The tribes in those two cases were allowed to choose allotments within their respective reservations, *then* the balance of the land was absolutely stripped of its reservations status. *See Hagen,* 510 U.S. at 412 ("The operative language of the 1902 Act provided for allocations of reservation land to Indians, and that "all the unallotted lands within said reservation shall be *restored to the public domain.*" 32 Stat. 263 (emphasis added). As conceded by Pender, no such "restoration to the public domain" language appears in the Act of 1882.

Similarly, the Act at issue in *Rosebud Sioux* provided language of "immediate cession:"

> The said Indians belonging on the Rosebud Reservation, South Dakota, for the consideration hereinafter named, do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to all that part of the Rosebud Indian Reservation now remaining unallotted.

*Rosebud Sioux,* 430 U.S. at 597. Again, Pender concedes no similar language of cession appears in the Act of 1882.

22

Next, Pender claims that Congress and the Omaha Tribe acted as if a discrete, easily identifiable parcel of land was removed from the Reservation. This argument also fails, because Omaha Tribe members *did* choose allotments from the western part of the Reservation, and indeed, were required to do so before the surrounding land could be offered for sale to non-Indians. (App. at 140, ¶¶ 86-89). Thus, Pender's assertion that a "slab of land" west of the abandoned railroad right-of-way was offered for sale and thus constitutes a discrete parcel of land fails as a matter of fact and law.

Pender also claims that "[c]ourts have not hesitated to find diminishment based solely on the second two *Solem* factors." (Appellant Br. at 45). To support this contention, Pender cites *Osage Nation v. Irby,* 597 F.3d 1117 (10th Cir. 2010), and *Wisconsin v. Stockbridge-Munsee Community,* 554 F.3d 657 (7th Cir. 2009). Pender's reliance on these cases for this proposition is misplaced.

Contrary to Pender's representation of *Osage Nation,* the Tenth Circuit analyzed all three of the *Solem* factors. 597 F.3d at 1123-24. However, the statute at issue was unique and not susceptible to the first prong of the traditional diminishment analysis because it was not a Surplus Land Act and did not involve sales of land to non-Indians:

> Unlike other allotment acts, the Act did not directly open the reservation to non-Indian settlement. With the exception of certain parcels of trust land reserved for the Osage Nation, the Act allotted the entire reservation to members of the tribe with no surplus lands

23

allotted for non-Indian settlement. As the Act did not open any land for settlement by non-Osage, there is no sum-certain or any other payment arrangement in the Act. And neither the Osage Allotment Act nor the Oklahoma Enabling Act contain express termination language.

*Id.* The implication that the *Osage Nation* court conducted analysis of a similar Act of Congress, or that it found diminishment without considering the first prong is inaccurate.

Likewise, in *Wisconsin*, the Seventh Circuit unequivocally examined the statute at issue. 554 F.3d at 662-63. The court found language which indicated a Congressional intent to "slice the opened lands off from the reservation." *Id.* at 663 (agreeing that the 1871 Act at issue diminished the reservation). The court then buttressed this conclusion by an examination of the second and third prongs. *Id.* at 663-65. Finally, there was an express recognition of the unique nature of the legislation it reviewed, as well as the unique historical context of the tribe:

> [T]oday's decision does not constitute a departure from the general rule that once Congress has established a reservation, its boundaries remained fixed unless Congress explicitly diminishes those boundaries or disestablishes the reservation. As the court's opinion makes explicit, this general proposition is firmly embedded in our jurisprudence. *See* [*Solem,* 456 U.S. at 470]. Moreover, explicit legislative language remains "[t]he most probative evidence of congressional intent." *Id.*
>
> Today's opinion not only states these propositions unequivocally, but also demonstrates cogently that the unique historical context makes it unreasonable for us to demand a clearer statement in the statutory language.

24

*Wisconsin,* 554 F.2d at 665 (Ripple, J., concurring).

As the District Court aptly concluded, the language of the 1882 Act "does not "clearly evince" Congress' "intent to change boundaries" of the Omaha Reservation. Mem. Op. at 36 (citation omitted). "Rather, the 1882 Act indicates that the United States intended to act as the Omaha Tribe's sales agent for purposes of surveying and auctioning [portions] of its land west of the right-of-way, with the proceeds held in trust in the United States Treasury for the benefit of members of the Omaha Tribe." *Id.* (citations omitted).

**B.      The Second Prong:  There is no clear and unambiguous evidence of a widely-held contemporaneous understanding that Congress intended to alter the boundaries of a reservation**

The second prong of the Supreme Court analysis is focused upon the events surrounding the passage of an allotment-era land Act for clear-cut evidence of a "widely-held contemporaneous understanding" that Congress intended to alter the boundaries of a reservation. *Solem,* 465 U.S. at 471.  These factors include the legislative history of the Act, reports on the negotiations surrounding the land sale, executive and presidential declarations, including reports from executive agencies overseeing Indian matters, and other Congressional enactments surrounding the passage of a Surplus Land Act.  *Rosebud Sioux,* 430 U.S. at 602; *Seymour,* 368 U.S. at 356-57.  Most importantly, in the absence of a "clear expression" in the statutory language relating to Congressional intent, only "*unequivocal*" evidence

25

gleaned from the surrounding circumstances will permit a finding of diminishment of a reservation. *Yankton Sioux*, 522 U.S. at 351 (emphasis added).

1. Treaties of 1854 & 1865

Under this prong, the Supreme Court has consistently examined all relevant treaties and statutes affecting the reservation land in question.

Examples of Congressional actions that *did* result in diminishment of Omaha Tribe land stand in stark contrast to the language of the 1882 Act.

The Omaha Treaties of 1854 and 1865 [App. 599-605 and 643-648, respectively], expressly demonstrate that both Congress and the Omaha Tribe knew how to alter the reservation boundaries when they chose to do so. Mem. Op. at 35:

> In the Omaha Treaties of 1854 and 1865, the [Omaha] Tribe expressly agreed to "cede, sell, and convey" land to the United States and "relinquish . . . all claims" thereto in exchanged for fixed sums of money, demonstrating that both Congress and the [Omaha] Tribe knew how to alter the reservation boundaries when they chose to do so. ([App. 599-605], 1854 Treaty ("The Omaha Indians cede to the United States" and "relinquish to the United States all claims" in exchange for specific sums of money); ([App. at 643-648], 1865 Treaty ("The Omaha tribe of Indians do hereby cede, sell, and convey to the United States as tract of land" and "the United States agree to pay to the said Omaha tribe of Indians the sum of fifty thousand dollars").

The Act of 1882 is devoid of any language similar to the foregoing. Accordingly, the District Court found the treaty language to be substantially different from that employed in the 1882 Act, and that this distinction was

Appellate Case: 14-1642    Page: 31    Date Filed: 07/08/2014 Entry ID: 4172664

"particularly illuminating." *Id.* at 35-36 (quoting *Duncan Energy Co. v. Three*

*Affiliated Tribes of the Ft. Berthold Reservation,* 27 F.3d 1294 (8th Cir. 1994)):

> We find the contrast between the provisions of the 1910 Act and the language employed in the 1891 Fort Berthold Treaty to be particularly illuminating. In the 1891 Treaty, the Tribe agreed to "cede, sell, and relinquish to the United States all their right, title, and interest in" a portion of the Reservation. 26 Stat. 1032. Thereafter, the Treaty referred to the "diminished Reservation" and provided for surveying to mark the new "outboundaries of the diminished Reservation." *Id.* at 1035. *It would be contrary to the principle of resolving ambiguities in favor of the Indians were we to conclude that Congress intended the same meanings for the vastly different language employed in these two documents affecting the Tribe.*

*Duncan,* 27 F.3d at 1297 (emphasis added).

In sum, the vastly different language used in the Omaha Treaties versus the Act of 1882 prohibit a finding of intent to diminish the Omaha Reservation in the latter.

### 2.    The 1872 Act

In its briefing to the Tribal Court and the District Court, Pender always argued that the 1872 Act, ch. 435, 17 Stat. 391, provided evidence of "intent" in the Act of 1882 to diminish the Omaha Reservation. Until now, Pender never suggested that the 1872 Act, in and of itself, effected a diminishment. Indeed, the current argument that the Omaha Reservation may have been diminished by the Act of 1872 is raised for the first time in this appeal. "[W]e do not consider

Appellate Case: 14-1642    Page: 32    Date Filed: 07/08/2014 Entry ID: 4172664

arguments raised for the first time on appeal." *Dorothy J. v. Little Rock School Dist.,* 7 F.3d 729, 734 (8th Cir. 1993) (citation omitted).

Regardless of whether this argument is properly before this Court, it cannot withstand scrutiny. The District Court correctly articulated the legal significance of the removal of the term "separate" in the Act of 1882:

> However, if use of the word "separate" in proposed and actual legislation prior to 1882, as well as the phrase "to be separated from the remaining portion of said reservation" in the 1872 Act, have any legal relevance, then equally significant is Congress's decision to remove the word and phrase from the 1882 Act at issue here.

Mem. Op. at 41.

### 3. Legislative history of the 1882 Act

Next, the District Court turned its attention to the circumstances surrounding the passage of the 1882 Act, including its legislative history.[4] After a thorough analysis, the District Court concluded:

> [T]he only thing that can be said with certainty is that Congress understood that the stated purpose of the legislation at issue was "to sell this land and get it into cultivation, and the object of the Indians is to get the money and have it put in trust for them here in Washington where they can draw their interest."

Mem. Op. at 39 (citations omitted).

> None of this legislative history establishes that Congress clearly contemplated that the area west of the right-of-way—whether sold in a "block" or in parcels among Indian allotments—would no longer be within the Omaha Reservation boundaries after the 1882

---

[4] The parties' stipulated facts pertaining to the legislative history are found at App. 135-140, at ¶¶ 59-85.

28

Act. Indeed, the parties do not cite, nor does the court find, specific discussion of how, if at all, the 1882 Act would impact Omaha Reservation boundaries or whether the Act would transfer the Omaha Indians' tribal sovereignty in a particular geographic area. *See, e.g., Yankton Sioux Tribe v. Gaffey,* [188 F.3d 1010, 1025 (8th Circuit 1999)] (noting that because Yankton Indian Commission report to Congress did not describe reservation boundaries or mention transfer of tribal sovereignty, the report did not indicate "clear and plain congressional intent" to terminate reservation status of nonceded lands).

*Id.* at 40.

> The legislative history leading up to the passage of the 1882 Act is insufficient to establish an "unequivocal," widely held, contemporaneous understanding that the 1882 Act would diminish or alter the boundaries of the Omaha Reservation, as opposed to merely authorize the sale of reservation land to non-Indian settlers for the Omaha Tribe's benefit—that is, to remove certain land within the Omaha Reservation from Indian control while retaining the reservation's original exterior boundaries.

*Id.*

In briefing to this Court, Pender unduly emphasizes certain terms and phrases, including "diminished," "diminish," and "segregated." (Pender Br. at ECF 47, 54, 55). This attempt to misguide the analysis is transparent and ineffectual. In response to this argument, the District Court pointed out that reliance on such terms and phrases was unavailing:

> Like the use of the phrase "separate" in prior legislation, the Commissioner of Indian Affairs' two isolated statements—10 years prior to the 1882 Act—referring to "diminishing these reservations" and "diminished reserve" also carry little weight. The Supreme Court has held that even direct, contemporaneous congressional language "scattered through the legislative history" referring to "reduced reservation[s]" or "reservations as diminished" is ambiguous for

29

purposes of diminishment analysis. *Solem,* 465 U.S. at 478. In using such phrases, "it is unclear whether Congress was alluding to the reduction in Indian-owned lands that would occur once some of the opened lands were sold to settlers or to the reduction that a complete cession of tribal interests in the opened area would precipitate." *Id.*; *see also [Lower Brule Sioux Tribe v. State of South Dakota,* 711 F.2d 809, 819] (holding that the phrase "as diminished" had "nothing to do with the location of reservation boundaries" and fell short of establishing congressional intent to disestablish).

Mem. Op. at 41-42.

Even though the *Solem* Court found the language of the Act alone sufficient to find non-diminishment, the Court addressed the remaining factors of the Court's diminishment construction framework. A number of passages in the legislative history discussed the legislation's effect of reducing the reservation and whether the Indians would have sufficient land remaining after implementation of the Act for the present and future needs of the tribes. The Court explained that such sundry Congressional debate and discussion were not convincing stating:

> However, it is unclear whether Congress was alluding to the reduction in Indian-owned lands that would occur once some of the opened lands were sold to settlers or to the reduction that a complete cession of tribal interests in the opened area would precipitate. Without evidence that Congress understood itself to be entering into an agreement under which the Tribe committed itself to cede and relinquish all interests in unallotted opened lands, and in the absence of some clear statement of congressional intent to alter reservation boundaries, it is impossible to infer from a few isolated and ambiguous phrases a congressional purpose to diminish the Cheyenne River Sioux Reservation.

465 U.S. at 478 (emphasis added).

Appellate Case: 14-1642      Page: 35      Date Filed: 07/08/2014 Entry ID: 4172664

The District Court's ultimate and correct conclusion was that both the language in the 1882 Act and its legislative history "fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands," and that it was "bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening." (Mem. Op. at 42).

## C. The Third Prong: There is no clear and unambiguous evidence of subsequent conduct or demographic history that supports diminishment.

The third and "least compelling" prong of the Supreme Court analysis involves the examination of the subsequent jurisdictional and demographic history of the region opened for settlement under the 1882 Act. *Solem,* 465 U.S. at 472. While this analysis may provide an additional clue as to what Congress foresaw in enacting the 1882 Act, it constitutes an "unorthodox and potentially unreliable method of statutory interpretation." (*Id.* at n.13).

As set forth in *DeCoteau,* there are "limits" in how far the courts must go to decipher Congressional intent "when both the Act and the legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands." *DeCoteau,* 420 U.S. at 470-71. If this Court agrees with the District Court's holdings on the first and second prongs, it need go no further.

31

The Omaha Tribe agrees with the District Court that the evidence of subsequent jurisdictional and demographic history presents a "mixed record," which fails to reveal "a consistent or dominant approach to the territory at issue," is of "limited interpretive value," carries "little force," and cannot be considered dispositive of the question whether Congress intended to diminish the Omaha Reservation in the 1882 Act. (Mem. Op. at 45). But the Omaha Tribe submits that more compelling facts exist in favor of non-diminishment.

1.    Allotments

Section 8 of the 1882 Act allowed the Omaha Tribe members to take their allotments anywhere on the Reservation, including west of the railroad right-of-way. In April 1883, the Secretary of the Interior appointed Alice Fletcher as a special agent to oversee the allotment process. Fletcher urged the Omahas to select land near the railroad right-of-way because she considered this the best agricultural land and it also afforded rail access to markets. Her influence resulted in general members choosing allotments next to the railway, both east and west.

In April 1883, Commissioner of Indian Affairs, Hiram Price, wrote to Fletcher directing her to "please ascertain whether any of the Indians desire to make their selections west of the right-of-way of the Sioux City and Nebraska Railroad Company. It is important that their wishes in that respect be made known at once in order that the appraisement of the lands lying west of the railroad may

32

be proceeded with, if deemed desirable, without waiting for the completion of the allotments. . . ." (App. 140-141 at ¶ 89) (emphasis in original).

At the end of 1883, Commissioner Price reported that 10-15 Omaha Tribal members had taken allotments west of the railroad right-of-way. It is axiomatic that allotments could only be given or taken on Reservation land.

In sum, the Act of 1882 provisions for allotments, the ensuing encouragement to take allotments near and west of the railroad right-of-way, and the selection of allotments on the west are *only* consistent with non-diminishment.

### 2.    Post-sale activity

In 1887, the Secretary of the Department of the Interior referred to land west of the railroad right-of-way as "within the limits of the former Omaha Indian Reservation." (App 141 at ¶¶ 94-96). However, the Commissioner of Indian Affairs reported that many of the settlers had failed to pay for the acreages. Congress then authorized extensions of payment under the 1882 Act in 1885, 1886, 1888, 1890, and 1894. (App 141-142 at ¶ 97). The extension of payment in 1894 acknowledged that the Omahas retained an interest in these lands by adding a provision that "this Act shall be of no force and effect until the consent thereto of the Omaha Indians shall be obtained[.]" Further, non-Indian settlers on the Reservation lands west of the railroad also acknowledged the Omaha Tribe's retained interest in the lands by requesting the Omaha Tribe's acquiescence in the

33

payment extensions. Federal officials agreed to the request and on December 23, 1895, the Omaha met in council with Indian Agent William Beck and gave their permission for payment schedules for Reservation lands west of the railroad to be extended. (App 141-142 at ¶ 97).

Under the terms of the 1888 extension, if a settler defaulted on payment for land west of the right-of-way, the land was to be sold at public auction rather than revert back to the Omaha Tribe. (App 142 at ¶ 98). However, the proceeds from any sale of the land continued to inure for the benefit of the Omaha Tribe. (*Id.*) Congressional reports focusing upon this extension also refer to the land as being "on the Omaha Reservation" or individuals buying lands west of the railroad as "purchasers of land of the Omaha tribe." (App. 142 at ¶¶ 98-99).

In 1900, Secretary of Interior Ethan Allen Hitchcock ruled that settlers who purchased land west of the railroad right-of-way were not subject to homestead legislation because they were settled on lands "in the Omaha reservation." (App. 142 at ¶ 100).

In sum, it can be clearly gleaned from statements and conduct of the United States Government after the 1882 Act that the land west of the railroad right-of-way remained part of the Omaha Reservation.

Appellate Case: 14-1642    Page: 39    Date Filed: 07/08/2014 Entry ID: 4172664

### 3. Demographic history within Pender

Many Omahas regularly visited Pender, resided in the village, and conducted business there.  Excerpts from the correspondence and diary of Rosalie Farley, whose allotments were located west of the railroad right-of-way, indicate that her family resided on her allotment, and that she and other Omahas regularly visited Pender, conducted business at that location and attended concerts in the village. (App. 143-144 at ¶¶ 114, 116).

Between 1890 and 1895, Thomas Sloan, an attorney and member of the Omaha Tribe, maintained both a residence and a law office in Pender where he employed an Omaha as a clerical assistant.  Sloan also served as Mayor of Pender, Thurston County Surveyor, and Justice of the Peace.

Hiram Chase, another attorney and enrolled member of the Omaha Tribe, resided and practiced law in Pender, where his children attended public schools. Chase also served as Thurston County Attorney for eight years, before being elected as County Judge.  (App. 145-145 at ¶¶ 117-121).

In 1911, the United States Supreme Court had occasion to comment on the Omaha Tribe's involvement in the Village of Pender and Thurston County as a whole:

> That Omaha Indians have taken part in the State and County government, extending over the reservation, and have held the following offices in said county of Thurston, State of Nebraska: County Coroner, County Attorney, County Judge, Justice of the

35

Peace, Constable, Road Overseer, Election Officers, and have also served as jurors in the county and district Courts.

*Hallowell v. United States,* 221 U.S. 317, 320 (1911).

The District Court properly concluded that the continued "community involvement by members of the Omaha Tribe suggests their understanding that Pender sits within reservation boundaries." Mem. Op. at 46.

4.    Thurston County boundaries

In 1922, the Nebraska Legislature corrected the legal description of Thurston County to include the original Omaha Reservation borders, including the land west of the railroad right-of-way. *Compare* Compiled Statutes of Nebraska 1889, chapter 17, § 75b with Compiled Statutes of Nebraska 1922, chapter 13, § 804. The correction to incorporate the original boundaries of the Omaha Reservation into Thurston County's legal definition clearly demonstrates that the State of Nebraska knew the Omaha Indian Reservation boundaries were unaltered by the Act of 1882.

Even the Thurston County website admitted the entire county constituted Reservation land:

The two reservations [the Omaha Indian and Winnebago] are still in existence today and cover the entire Thurston County area.

App. 146 at ¶128. Only after the parties were amidst expert discovery was this content removed. *Id.*

36

5. Historical summary

In November 1961, an Indian Agency operating under the Bureau of Indian Affairs (BIA) issued a "Historical Summary for Omaha Reservation," stating that boundaries of the Omaha Reservation were delineated in the original survey of 1855, and were only diminished by two sales of land to the United States for the benefit of the Winnebagos. According to the "Summary," these "two statutory cessions . . . are the only changes effected in the boundaries of the Omaha Reservation since its inception. The later enactments authorizing sale of various lands included within these boundaries are not considered to have had the effect of terminating Federal jurisdiction over them." (App. 145-146 at ¶¶ 123-24).

6. Retrocession

On April 16, 1969, the Nebraska State Legislature voted to retrocede to the United States all jurisdiction over offenses committed by or against Indians in the areas of Indian country located in Thurston County, Nebraska, except for offenses involving operation of motor vehicles on public roads or highways. The United States Government, through the Secretary of the Interior, accepted the retrocession of jurisdiction on October 16, 1970. Significantly, the legal description of the land in the Notice of Acceptance of Retrocession of Jurisdiction delineates the Omaha Indian Reservation as originally surveyed (including land west of the railroad right-of-way and the Village of Pender). (App. 146 at ¶¶ 125-27).

37

7.    <u>Opinion of the Office of the Solicitor, U.S. Department of the Interior</u>

On April 16, 2012 Patrice H. Kunesh, Deputy Solicitor for Indian Affairs in the United States' Solicitor's Office in Washington, in a letter to Priscilla Wilfahrt, Twin Cities Field Solicitor, wrote:

> I have reviewed your letter of April 24, 2008, to the Great Plains Regional Director of the BIA, which concludes that the boundaries of the Omaha Indian Reservation have not been diminished. The April 24, 2008, letter supersedes your Office's letter of June 27, 1989 [the Kimball Opinion], to the Great Plains Regional Director regarding "Survey of Western Boundary of Omaha Reservation." The June 27, 1989 letter [the Kimball Opinion] is hereby withdrawn and not to be relied upon.

The Department of the Interior, the Office of the Solicitor in Washington, D.C., the Field Solicitor's Office in Minnesota, and the Winnebago Agency in Nebraska have been instructed to rely upon the April 24, 2008, Wilfahrt Letter finding of non-diminishment. App. 146-147, ¶¶ 129-36.[5]

8.    <u>Other significant activity evidences that the Omaha Reservation borders remain unchanged since 1865</u>

In 2007, Teri Lamplot, while Chair of the County Board of Supervisors for Thurston County, asked the U.S. Census Bureau to revise the boundaries of the Omaha Indian Reservation to place Pender outside of the Omaha Indian

_____

[5] The "Kimball Opinion" had to be officially withdrawn because it incorrectly concluded that no "Indian trust allotments were made on lands lying west of the Sioux City and Nebraska Railroad right-of-way," a circumstance which is clearly incorrect, because the allotment map shows that there were at least 15 allotments taken west of the railroad right-of-way following the passage of the 1882 Act. App. 146-147, ¶¶ 129-33.

38

Reservation. In response to Lamplot, the U. S. Census Bureau informed Lamplot that it was "unable to make the changes to our database" and would continue to rely upon a 1999 BIA map which indicated that Pender fell within the western boundary of the Omaha Indian Reservation. (App. 151 at ¶¶ 160-61).

On March 6, 1992, the Nebraska State Tax Commissioner issued a Revenue Ruling stating that the Village of Pender, among others, is located within the boundaries of the Omaha Indian Reservation. (App. 149 at ¶ 148).

Beginning on October 1, 2005, the Omaha Tribe and the State of Nebraska entered into an Agreement for the Collection and Dissemination of Motor Fuel Taxes between those parties on sales of motor fuel made on the Omaha Reservation, including sales in Pender. (App. 149 at ¶ 150). This sharing of the economic benefits generated on the Omaha Indian Reservation was amicable, and treated like any binding contract, until the Nebraska Attorney General unilaterally terminated payments during the course of this litigation, but long before the State intervened. Pender criticizes the Omaha Tribe for not exerting its tribal authority west of the abandoned railroad right-of-way in recent years, yet the record reflects that every effort to do so was met with Pender's opposition. (App. 149 at ¶¶ 151-53; App. 150-151 at ¶ 159 App. 151-152 at ¶¶ 162-67).

Pender's intimidation of the Omaha Tribe, through serial lawsuits (*infra*) and defiance of Omaha Tribal authority, does not justify diminishment.

39

The Omaha Tribe acknowledges that an analysis of the available historical maps, leads to contradictory conclusions. Indeed, the maps are all over the board. Thus, an attempt to reconcile these conflicting maps would be an exercise in futility.

### 9.   Pender's Parade of Horribles does not withstand scrutiny

Pender argues that a "determination that this land is a part of the Omaha Reservation would require jarring changes to the manner in which governmental services are provided and unsettle the 'justifiable expectations' of the nonmembers living west of the railroad right of way." (Pender Br. at 58). This is an exaggeration. The Federal, State, County, and Tribal authorities have managed quite peaceably and adequately to co-exist in many respects. *See, e.g.,* the Stipulated Motion to Stay filed with the Eighth Circuit, which includes a Memorandum of Understanding regarding law enforcement.

If anything, the "justifiable expectations" of the Omaha Tribe are the ones that are in jeopardy. Unquestionably, the cancelation of the fuel tax sharing arrangement has serious implications that even Intervenor-State of Nebraska concedes in defending an earlier challenge to the fuel tax agreement (*see infra*):

> [The] Omaha Tribe would suffer a loss of revenue derived from the fuel tax imposed by the agreement between the State of Nebraska and the Omaha Tribe. Such conclusions would result in the Omaha Tribe suffering irreparable loss of both revenue and property[.]
>
> ***

Appellate Case: 14-1642   Page: 45   Date Filed: 07/08/2014 Entry ID: 4172664

In the instant case, if the tribes were to lose land through diminishment of the reservation and the resultant revenues therefrom, the revenues generated through the sale of motor fuel by the facilities located on the land that would be removed from the reservation and which is now utilized for maintenance and upkeep of the infrastructure of the tribal reservation lands would be lost to the tribe to their detriment.

*Lamplot v. Heineman,* 4:06-cv-03075 (Brief in Support of Motion to Dismiss,

District Court Filing CM/ECF #14 at 2-4).

The District Court considered the third prong, and concluded:

As was the case with state and federal agencies' inconsistent treatment of the disputed land following the 1882 Act, this "mixed" evidence regarding the demographics of the area west of the right-of-way is not dispositive. *Solem,* 465 U.S. at 478-79 (finding no diminishment where "[t]he subsequent treatment of the Cheyenne River Sioux Reservation by Congress, courts, and the Executive is so rife with contradictions and inconsistencies as to be of no help to either side"); *Duncan Energy,* 27 F.3rd at 1297 ("Throughout the [diminishment] inquiry, ambiguities are to be resolved in favor of the Indians, and diminishment should not be found lightly.").

Even if this demographic evidence did establish diminishment, it cannot overcome my conclusion that the language of the 1882 Act itself does not clearly evince Congress' intent to diminish the Omaha Reservation. *Duncan Energy,* 27 F.3d at 1298 ("We find . . . exclusive reliance on the third *Solem* factor to create a quasi-diminishment totally inappropriate.").

Mem. Op. at 47-48.

The Omaha Tribe submits that this Court should reach the same conclusion.

41

## II.   State's Contradictory Positions & Admissions:   Challenge to the Agreement for the Collection and Dissemination of Motor Fuel Taxes

In 2006, Teri Lamplot (the same person to request the amendment of census records, discussed *supra*),  joined a set of Plaintiffs who brought an action in the United States District Court for the District of Nebraska alleging violation of civil rights related the collection and remittance of motor vehicle fuel tax by the State to the Omaha Tribe.  *Lamplot v. Heineman,* 4:06-cv-03075 (Complaint, District Court Filing CM/ECF #1[6].  The matter was ultimately dismissed for failure to state a claim and failure to join an indispensable party.

The State of Nebraska's arguments in the *Lamplot* case are in direct contradiction to its arguments made before this Court.  In *Lamplot*, the State argued:

> Plaintiffs contend that Pender is not part of the reservation.  Those assertions have no factual basis.
>
> ***
>
> Moreover in further contradiction to the Plaintiffs claim that Pender is not within the reservation boundaries are letters from the United States Department of the Interior, Bureau of Indian Affairs dated February 14, 2005 and March 7, 2005.  (Exhibits 3 and 4 attached hereto).[7]  Both letters state that there has been no diminishment of the

---

[6] It is notable that Lamplot, *et al.* were represented by the same attorneys currently representing Pender.  *Id.*

[7] These letters are respectively, Ex. 3, a February 14, 2005 letter from the BIA to then-counsel for the Omaha Tribe, informing them that the BIA did not consider the Omaha Reservation boundaries to have ever been diminished, citing an August 13, 1999 letter, and Ex. 4, a March 7, 2005 letter to then-Omaha Tribe Chairman,

reservation and that the Village of Pender is within the boundaries of the Omaha Reservation.

*Id*.

But now, the State has argued in favor of diminishment and to give no weight to the 2005 BIA letters. The State cannot have it both ways.

## CONCLUSION

The creation of Indian tribal lands, whether declared by treaty or statute, is considered sacred. Thus the diminishment of any tribal reservation must be explicitly indicted by Congress. Here, the statutory language, the legislative history, circumstances surrounding the 1882 Act, and conduct subsequent to the Act, do not demonstrate clear Congressional intent to eliminate any portion of the Omaha Tribe's sacred lands. The Omaha Tribe respectfully requests this Court affirm the District Court in its entirety.

---

reiterating that the BIA was of the opinion that no diminishment had occurred with respect to the Omaha Reservation.

Appellate Case: 14-1642    Page: 48    Date Filed: 07/08/2014 Entry ID: 4172664

Respectfully submitted this 7th day of July, 2014.

/s/ Nora M. Kane
Nora M. Kane, NE #21562
Patricia A. Zieg, NE #14662
Stinson Leonard Street LLP
1299 Farnam St., Suite 1500
Omaha, NE 68102
Phone: (402) 342-1700
Fax: (402) 930-1701
nora.kane@stinsonleonard.com
patricia.zieg@stinsonleonard.com

and

Mark J. Peterson, NE #18850
Peterson Law Office, LLC
5201 Chicago Street
Omaha, NE 68132
Phone:  (402) 517-2161
mark.peterson.omaha@gmail.com

Dated: July 7, 2014                    Attorneys for Defendants-Appellees

44

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies:

1.    Brief of Appellees Mitch Parker, et al. complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,209 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) as reflected by electronic verification through Microsoft Word 2010.

2.    The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in proportionally spaced 14 pt Times New Roman typeface using Microsoft Word 2010.

3.    The electronic version of this Brief of Appellees has been scanned for viruses and has been determined to be virus-free.

/s/ Nora M. Kane
Nora M. Kane, NE #21562
Patricia A. Zieg, NE #14662
Stinson Leonard Street LLP
1299 Farnam St., Suite 1500
Omaha, NE 68102
Phone: (402) 342-1700
Fax: (402) 930-1701
nora.kane@stinsonleonard.com
patricia.zieg@stinsonleonard.com

and

Appellate Case: 14-1642    Page: 50    Date Filed: 07/08/2014 Entry ID: 4172664

Mark J. Peterson, NE #18850
Peterson Law Office, LLC
5201 Chicago Street
Omaha, NE 68132
Phone: (402) 517-2161
mark.peterson.omaha@gmail.com

Dated: July 7, 2014                    Attorneys for Defendants-Appellees

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2014, a copy of the foregoing document was electronically filed with the Clerk of the United States Court of Appeals for the Eighth Circuit using the CM/ECF system causing notice of such filing to be served upon all parties' counsel of record.

*/s/ Nora M. Kane*
Nora M. Kane

DB03/0580031-0031/10126784.1