IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

RICHARD M. SMITH, et al.,
Plaintiffs-Appellants,

STATE OF NEBRASKA,
Intervenor Plaintiff-Appellant,
v.

MITCH PARKER, in his official capacity as Chairman of the
Omaha Tribal Council, et al.,
Defendants-Appellees,

THE UNITED STATES,
Intervenor Defendant-Appellee.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA (4:07-cv-03101 RGK)

_____

**RESPONSE BRIEF FOR THE UNITED STATES**
_____

SAM HIRSCH
Acting Assistant Attorney General

*OF COUNSEL:*

REBECCA ROSS
Attorney, Office of the Solicitor
U.S. Department of the Interior
1849 C Street N.W.
Washington, D.C. 20240

DARON CARRIERO
MARY GABRIELLE SPRAGUE
KATHERINE J. BARTON
Attorneys, Environment and
Natural Resources Division
U.S. Department of Justice
P.O. Box 7415
Washington, D.C. 20044
(202) 353-7712
katherine.barton@usdoj.gov

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Plaintiffs-Appellants Richard M. Smith, et al., brought suit against officials of the Omaha Tribe of Nebraska challenging the Tribe's enforcement of its beverage control ordinance against them. Plaintiffs-Appellants claimed that an 1882 federal statute purportedly diminished the boundaries of the Omaha Indian Reservation such that their businesses are located outside of the Reservation and thus are not subject to the ordinance. The United States intervened as a defendant and the State of Nebraska intervened as a plaintiff. The district court granted summary judgment in favor of the Tribe and the United States, finding no support for the claim that the 1882 Act diminished the Reservation in the statutory language and no evidence of a clear and plain congressional intent to diminish elsewhere in the record.

The United States believes that oral argument should be heard in this appeal because it involves questions of first impression in this Court regarding the boundaries of the Omaha Reservation.

i

# TABLE OF CONTENTS

Summary of the Case and Request for Oral Argument ................................. i

Table of Contents ............................................................................. ii

Table of Authorities ....................................................................... iv

Statement of Jurisdiction ..................................................................1

Statement of the Issues ....................................................................1

Statement of the Case .......................................................................1

    A.    Factual Background ..........................................................1

    B.    Procedural Background .................................................. 6

    C.    The District Court Opinion ............................................. 7

Summary of the Argument .............................................................. 9

Standard of Review .......................................................................12

Argument .....................................................................................12

    I.    THE 1882 ACT DID NOT DIMINISH THE OMAHA
        RESERVATION ........................................................12

    A.    The plain language of the 1882 Act demonstrates
        Congress did not intend to diminish the Omaha
        Reservation. ...............................................................16

        1.    The 1882 Act lacks language demonstrating
            congressional intent to diminish, including language
            that the Supreme Court has found to demonstrate
            diminishment. .......................................................17

        2.    The 1882 Act language is functionally identical to
            the hallmark language in statutes the Supreme
            Court has found *not* to effect diminishment.......... 24

Appellate Case: 14-1642     Page: 3     Date Filed: 07/08/2014 Entry ID: 4172819

3. The 1882 Act language starkly contrasts with the language of the 1854 and 1865 treaties that *did* diminish the Omaha Reservation boundaries. ...... 27

4. Plaintiffs' contrary arguments are unpersuasive. ... 28

B. The historical context and legislative history of the 1882 Act do not demonstrate an unambiguous intent to diminish. ........................................................ 31

1. The 1872 Act supports a finding that the 1882 Act did not diminish the Omaha Reservation. ............. 32

2. The legislative history does not support a finding of diminishment. ......................................... 42

C. Subsequent treatment of the area does not support a finding of diminishment. .................................. 45

1. Subsequent treatment by Congress shows it did not understand the reservation boundaries to be diminished. ............................................ 46

2. Subsequent treatment by the federal government and the State does not support a finding that the Reservation was diminished. ................................. 48

3. The subsequent pattern of settlement does not support a finding of diminishment. ....................... 59

D. Confirming the validity of the Omaha Reservation boundaries will not disrupt settled expectations or cause significant changes in the disputed area. ............. 62

Conclusion ..................................................... 65

Addendum ..................................................... 3

iii

# TABLE OF AUTHORITIES

**CASES**:

*Atkinson Trading Co. v. Shirley*,
 532 U.S. 645 (2001) ...................................................................... 63

*Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation*,
 492 U.S. 408 (1989).......................................................................... 63

*City of New Town v. United States*,
 454 F.2d 121 (8th Cir. 1972).................................................... 30, 46, 52

*DeCoteau v. Dist. Cnty. Ct.*,
 420 U.S. 425 (1975)................................................ 14, 17-19, 22, 26, 64

*Duncan Energy Co. v. Three Affiliated Tribes of the Fort Berthold
 Reservation*, 27 F.3d 1294 (8th Cir. 1994) .........1, 27, 28, 45, 59, 61-62

*Hagen v. Utah*,
 510 U.S. 398 (1994)................................ 13, 14, 17, 19, 22-24, 29, 31, 45

*In re Circle T Feedlot, Inc.*,
 2010 WL 3295104 (EPA Env. App. Bd. June 7, 2010) ....................... 53

*Johnson v. United States*,
 529 U.S. 694 (2000) .......................................................................... 39

*Lower Brule Sioux Tribe v. South Dakota*,
 711 F.2d 809 (8th Cir. 1983) ............................................................. 40

*Mattz v. Arnett*,
 412 U.S. 481 (1973) ...................................... 1, 15, 20, 21, 24, 25, 30, 45

*Metro Life Ins. Co. v. Taylor*,
 481 U.S. 58 (1987) .............................................................................. 33

*Montana v. United States*,
 450 U.S. 544 (1981)............................................................................ 63

Appellate Case: 14-1642 Page: 5 Date Filed: 07/08/2014 Entry ID: 4172819

*Nevada v. Hicks*,
    533 U.S. 353 (2001) ............................................................ 63

*Oliphant v. Suquamish Indian Tribe*,
    435 U.S. 191 (1978) ............................................................ 62

*Plains Commerce Bank v. Long Family Land & Cattle Co., Inc.*,
    554 U.S. 316 (2008) ............................................................ 63

*Rosebud Sioux Tribe v. Kneip*,
    430 U.S. 584 (1977).............................................15, 18, 22, 30

*Solem v. Barlett*,
    465 U.S. 463 (1984) .............1, 10, 12 - 14, 19, 20, 24 - 26, 31, 32, 45-47

*South Dakota v. Bourland*,
    508 U.S. 679 (1993) ............................................................ 63

*South Dakota v. Yankton Sioux Tribe*,
    522 U.S. 329 (1998) .................................. 14, 18, 22, 31, 34, 46, 49, 64

*Seymour v. Superintendent of Washington State Penitentiary*,
    368 U.S. 402 (1962) .................................................1, 20, 24-26, 28, 30

*Strate v. A-1 Contractors*,
    520 U.S. 438 (1997) ............................................................ 63

*TRW Inc. v. Andrews*,
    534 U.S. 19 (2001)..............................................................21

*United States v. Brown*,
    334 F. Supp. 536 (1971).......................................................56

*United States v. Celestine*,
    215 U.S. 278 (1909)............................................................12

*United States v. Dion*,
    476 U.S. 734 (1986)............................................................12

v

Appellate Case: 14-1642    Page: 6    Date Filed: 07/08/2014 Entry ID: 4172819

*United States v. Novak,*
    476 F.3d 1041 (9th Cir. 2007) (en banc) ............................................. 33

*United States v. Lara,*
    541 U.S. 193 (2004) .......................................................................... 62

*Yankton Sioux Tribe v. U.S. Army Corps of Engineers,*
    606 F.3d 895 (8th Cir. 2010) ............................................................. 12

## STATUTES:

18 U.S.C.§ 1161 .......................................................................................... 1, 9

18 U.S.C. § 1162 ........................................................................................... 56

25 U.S.C. § 1323 ........................................................................................... 56

28 U.S.C.  § 1331 ............................................................................................ 1

28 U.S.C § 1360 ............................................................................................ 56

Treaty of March 16, 1854, 10 Stat. 1043 ................................................. 1, 2, 27

Treaty of March 6, 1865, 14 Stat. 667 ........................................................ 2, 27

Act of June 10, 1872, ch. 534, 17 Stat. 391 .............................. 3, 32, 33, 37, 38

Act of August 7, 1882, ch. 434, 22 Stat. 341, .............................. 3, 4, 5, 20, 25

Act of March 3, 1885, ch. 341, 23 Stat. 362 .................................................. 47

Act of Aug. 2, 1886, ch. 844, 24 Stat. 214 ................................................... 47

Act of May 15, 1888, ch. 255, 25 Stat. 150 ................................................... 47

Act of August 19, 1890, ch. 803, 26 Stat. 329 .............................................. 47

Act of August 11, 1894, ch. 255, 28 Stat. 276 ......................................... 47, 48

Act of March 22, 1906, ch. 1126, 34 Stat. 80 ................................................ 25

vi

Violence Against Women Act,
     Pub. L. No. 113-4, 127 Stat. 54.......................................... 62

**STATE STATUTES:**

Compiled Statutes of Nebraska 1889, Chap. 17, § 75b................................ 54

Neb. Rev. St. § 22-187....................................................... 55

Neb. Rev. St. § 66-741....................................................... 57

**RULES and REGULATIONS:**

Neb. Rev. Rul. 99-76-6....................................................... 57

Neb. Rev. Rul. 99-89-2....................................................... 57

Neb. Rev. Rul. 99-90-1....................................................... 57

Neb. Rev. Rul. 99-92-1....................................................... 57

35 Fed. Reg. 16598 (1970) ................................................... 56

71 Fed. Reg. 10056 (2006) .................................................... 6

**LEGISLATIVE HISTORY:**

13 Cong. Rec. S3032 (April 19, 1882).......................................... 43

13 Cong. Rec. S3077 (April 29, 1882).......................................... 34

13 Cong. Rec. S3078 (April 29, 1882) ......................................... 34

13 Cong. Rec. H6537-6542 (July 26, 1882). .......................... 34, 35, 36, 43

13 Cong. Rec. H6571-6572 (July 27, 1882) ..................................... 44

Appellate Case: 14-1642   Page: 8   Date Filed: 07/08/2014 Entry ID: 4172819

**MISCELLANEOUS:**

Leg. Res. 234, 118th Leg., 2d Sess. (Neb. 2008). .......................................... 56

http://en.wikipedia.org/wiki/Public_Land_Survey_System....................... 3

ftp://ftp.sso.state.ne.us/maps/gloc/161.pdf ............................................... 58

ftp://ftp.sso.state.ne.us/maps/gloc/163.pdf ............................................... 58

http://www.loc.gov/resource/g4193cm.gla00166/#seq-15 ....................... 58

http://www.loc.gov/resource/g4193cm.gla00166/#seq-5 ....................... 58

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this action alleging violations of 18 U.S.C. § 1161 and federal common law under 28 U.S.C. § 1331. The district court entered final judgment on February 14, 2014. Appendix (APP) 263. Plaintiffs Richard M. Smith, et. al. (the Beverage Retailers), together with Plaintiff-Intervenor State of Nebraska (the State), jointly filed a timely notice of appeal on March 13, 2014. APP265.

## STATEMENT OF THE ISSUES

Whether Congress diminished the boundaries of the Omaha Indian Reservation by the Act of Aug. 7, 1882, Ch. 434, 22 Stat. 341.

Most apposite cases:

*Solem v. Barlett*, 465 U.S. 463 (1984)

*Mattz v. Arnett*, 412 U.S. 481 (1973)

*Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351 (1962).

## STATEMENT OF THE CASE

### A.    Factual Background[1]

The Omaha Tribe's Reservation was guaranteed by its 1854 Treaty with the United States. *See* Treaty of Mar. 16, 1854, 10 Stat. 1043 (APP600).

---

[1] The parties' Joint Stipulation of Facts is reprinted at APP127; the district court sets forth undisputed facts in its memorandum, reprinted at APP214.

In that treaty, the Tribe agreed to cede all right, title, and interest in a portion of its historic lands in exchange for $840,000 paid out over 40 years. *Id.*, Art. 1. The 1854 Treaty reserved specific lands for the Tribe but allowed the Tribe to exchange them for other lands should the reserved lands prove unsatisfactory. *Id.* The Tribe made such an exchange, which the United States administratively approved in 1855, thus establishing the Omaha Reservation, encompassing some 300,000 acres. APP2190, 2192-2193. The Reservation is located in northeast Nebraska within the present Thurston and Cuming counties.

In 1865, the Tribe agreed to "cede, sell, and convey" to the United States approximately 97,500 acres from the northern part of the Reservation in exchange for a fixed sum of $50,000 and certain other promises by the government. *See* Treaty of Mar. 6, 1865, 14 Stat. 667 (APP2195). The 1865 Treaty required the Tribe to "vacate and give possession of the lands ceded" so that land could be made available to the Winnebago Tribe.[2] *See id.*, Art. 1, 5. (A map depicting the Omaha and Winnebago reservations is reproduced at APP308 and in the Addendum to

---

[2] In 1874, the Omaha Tribe sold to the United States an additional 12,350 acres from the northeastern corner of the Reservation for the Winnebago Tribe. APP2201.

Appellate Case: 14-1642     Page: 11     Date Filed: 07/08/2014 Entry ID: 4172819

this brief.) The dispute in this litigation pertains to the Reservation's western boundary as it existed after ratification of the 1865 Treaty.

In 1872, in response to the Tribe's request for help in raising additional funds to aid its conversion to agriculture, Congress authorized the Secretary to survey, appraise, and sell up to 50,000 acres on the western side of the Reservation, to be delineated by a north-south line along the sections.[3] Act of June 10, 1872, ch. 435, 17 Stat. 391 (APP761). The 1872 Act provided that the purchase monies would be deposited in the U.S. Treasury to be used for the benefit of the Tribe. *Id.* The 1872 Act was unsuccessful in raising funds for the Tribe: only two sales comprising 300.72 acres were made under the statute. APP341.

In 1882, after the 1872 Act failed to provide financial relief to the Tribe, Congress passed another statute authorizing the Secretary to survey, appraise, and sell lands on the western side of the Reservation. *See* Act of August 7, 1882, ch. 434, 22 Stat. 341 (APP952). The 1882 Act is the statute

---

[3] "Sections" (as well as townships and range measurements mentioned later) are part of the public land survey system. *See, e.g.,* http://en.wikipedia.org/wiki/Public_Land_Survey_System.

3

on which Plaintiffs' base their claims in this case that the Reservation was diminished.[4]

The 1882 Act's operative language authorizing disposal of reservation lands provided that "the Secretary of the Interior be, and he hereby is, authorized to cause to be surveyed, if necessary, and sold, all that portion of reservation * * * in the State of Nebraska lying west of the right of way granted by said Indians to the Sioux City and Nebraska Railroad Company." *Id.* In 1880, the Tribe had granted the railroad company a right-of-way that traversed the western side of the Reservation running in a diagonal line from northwest to southeast. APP2206; *see also* APP 308 (map showing right-of-way). Congress thus altered in part what lands were to be available for sale, abandoning the north-south demarcation line provided for in the 1872 Act in favor of the subsequently established railroad right-of-way.

Section 2 of the 1882 Act ensured that the lands would be purchased by actual settlers, providing that "the Secretary of the Interior shall be, and he hereby is authorized to issue [a] proclamation to the effect that unallotted lands are open for settlement." 22 Stat. 341, § 2. Section 3 provided that the Tribe would benefit by having the "the proceeds of such

---

[4] Although the Beverage Retailers include the 1872 Act in their Question Presented, they brief it as providing only context for the 1882 Act, and their complaint claims diminishment resulted only from the 1882 Act. APP73.

4

sale * * * placed to the credit of said Indians in the Treasury of the United States." *Id.* § 3.

The 1882 Act also provided for completion of the allotment of reservation lands to tribal members, a process begun under the 1865 Treaty. APP2199, 2204. Notable for the purposes here, Section 8 of the Act provided that the Omahas "may, if they shall so elect, select the land which shall be allotted to them in severalty *in any part of said reservation either east or west of said right of way* mentioned in the first section of this act." *Id.* § 8 (emphasis added).

The 1882 Act succeeded where the 1872 Act had failed. Some tribal members selected allotments west of the right-of-way – land that had been the tribe's hunting ground; most, however, preferred to stay on the eastern side, near the Missouri River, where the tribe had long resided. APP2181-2183, 2193-2194. The remainder of the lands were sold and patented over approximately 40 years, ending in 1921. APP354.

As described in more detail below, for 130 years following the 1882 Act, the western boundary of the Omaha Reservation has been the subject of federal and state legislation, agency opinions, decisions, revenue rulings, and contracts, much of which treated the Reservation as undiminished. This case deals specifically with an alcoholic beverage control ordinance

Appellate Case: 14-1642    Page: 14    Date Filed: 07/08/2014 Entry ID: 4172819

adopted by the Tribe on June 15, 2004 and certified by the Department of the Interior in 2006. 71 Fed. Reg. 10,056 (2006). Within a year, the Tribe began notifying reservation liquor retailers, including the Beverage Retailers in Pender, of the ordinance and its requirements. APP131. Pender is a town of approximately 1300 citizens located in Thurston County. APP72. It is situated on land lying west of the Sioux City and Nebraska railroad right-of-way, indisputably within the original reservation boundary.

## B. Procedural Background

In 2007, the Beverage Retailers sued tribal officials in federal district court seeking a declaration that Pender is not within the Omaha Reservation and an injunction barring the Tribe from enforcing its liquor ordinance against them. The complaint alleged that "[a]s a result of the 1882 Act, Pender is not part of any federally recognized Indian reservation." APP73.

The district court, at the urging of the Beverage Retailers and subsequently upon stipulation of the parties, temporarily restrained the Tribe from enforcing the ordinance pending resolution of the litigation. APP57, 61. The court subsequently held that the Beverage Retailers had to exhaust their remedies in Omaha Tribal Court and stayed the district court

6

action, allowing relief therefrom if the tribal court did not proceed expeditiously. APP63-64. The court ordered that the temporary restraining order remain in place during the stay. APP66.

Plaintiffs filed their tribal court complaint in January 2008, making the same allegations and seeking the same relief as in the district court. Several years of discovery and preparation of expert historical reports followed, with briefing completed in October 2012. On February 4, 2013, the tribal court issued an opinion concluding that the 1882 Act did not diminish the Omaha Reservation boundaries. APP79.

The action resumed in the district court. APP123. The State intervened as a plaintiff, alleging that the Tribe's collection of its share of motor fuel tax revenue in the disputed area, under a Tribal-State motor fuel tax agreement, exceeds tribal authority because the disputed area is not within the Reservation. Docket Entry (DE) 107. The United States intervened as a defendant. DE 108. Briefing on cross-motions for summary judgment was completed in August 2013.

## C.    The District Court Opinion

On February 13, 2014, the district court entered judgment in favor of the Defendants. APP214. Addressing the first prong of the diminishment analysis as established by Supreme Court case law, the district court agreed

Appellate Case: 14-1642    Page: 16    Date Filed: 07/08/2014 Entry ID: 4172819

with Plaintiffs that "the express language of the 1882 Act does not incorporate terms which the [Supreme] Court has previously determined to be clear evidence of Congressional intent to diminish." Op. 34 (APP247). The court found instead that the Act indicated only that "the United States intended to act as the Omaha Tribe's sales agent for purposes of surveying and auctioning its reservation land west of the right-of-way, with the proceeds held in trust in the United States Treasury for the benefit of members of the Omaha Tribe." *Id.* (citation omitted).

The court rejected Plaintiffs' contention that the historical context surrounding passage of the Act made clear that Congress intended to diminish and alter the boundaries of the Reservation. Op. 38 (APP251). The court recognized that in the absence of a clear expression of congressional purpose to diminish a reservation, only unequivocal evidence derived from surrounding circumstances, revealing a widely held, contemporaneous understanding that the reservation boundaries would be diminished, could support a conclusion that a reservation was diminished. *Id.* The court found the legislative history contained no discussion regarding how the 1882 Act would impact the reservation boundaries, or whether it would affect tribal sovereignty in the disputed area, and thus did not demonstrate the requisite unequivocal understanding that the statute would diminish the

Appellate Case: 14-1642    Page: 17    Date Filed: 07/08/2014 Entry ID: 4172819

reservation boundaries. Op. 40 (APP253). The court also found that the 1872 Act and two isolated statements by a federal official describing it provided no evidence that the 1882 Act was intended to diminish the Reservation. Op. 41 (APP254).

Finally, the district court addressed the third prong of the diminishment analytical structure – the subsequent treatment of the area and pattern of settlement. The court found the record is mixed on the subsequent treatment of the area, failing to reveal a consistent or dominant approach to the disputed territory, and thus is of limited interpretive value. Op. 45 (APP258). It found that the evidence regarding the demographics of the area is likewise mixed and thus not dispositive, and that even if it favored a finding of diminishment, it could not overcome the lack of any clear intent in the language of the 1882 Act. Op. 46-47 (APP259-260).

As the Beverage Retailers conceded that 18 U.S.C. § 1161 permits the Omaha Tribe to regulate liquor sales on the Reservation, APP74, the court entered judgment for Defendants.

## SUMMARY OF THE ARGUMENT

Congress's intent to diminish a reservation must be "clear and plain," under a standard that considers: (1) the text of the relevant statutory language; (2) the legislative history and other contemporaneous surrounding

Appellate Case: 14-1642    Page: 18    Date Filed: 07/08/2014 Entry ID: 4172819

circumstances; and (3) as a subsidiary consideration, subsequent events. *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343-344 (1998) (internal quotations and citations omitted). The "most probative" factor is the statutory language, *id.* at 344, and where "both an act and its legislative history fail to provide substantial and compelling evidence" of intent to diminish, courts "are bound" to rule against diminishment, *Solem v. Barlett*, 465 U.S. 463, 472 (1984). A court may "not lightly conclude that an Indian reservation has been terminated" and must resolve ambiguities in favor of the Tribe. *DeCoteau v. District County Court*, 420 U.S. 425, 444 (1975).

The 1882 Act did not diminish the boundaries of the Omaha Reservation. The Act's plain language merely authorizes the Secretary to sell unallotted lands on a portion of the Reservation, with the Tribe receiving whatever proceeds those sales generate. That language is the same as that in each of the three cases where the Supreme Court has held that a diminishment did not occur – placing the 1882 Act at the "extreme," non-diminishment, end of the spectrum of surplus land acts that the Supreme Court has considered. The Act contains none of the statutory language that the Court has found to support a finding of diminishment – cession of all title and interest to the United States, restoration of the lands

Appellate Case: 14-1642     Page: 19     Date Filed: 07/08/2014 Entry ID: 4172819

to the public domain, or payment of a sum-certain to the tribe – even though Congress and the Omaha Tribe had used such language in earlier treaties that indisputably *did* diminish the Reservation. The statute thus provides no evidence of intent to diminish.

That the 1882 Act did not diminish the Reservation is confirmed by Congress's treatment of the 1872 Act, which in virtually identical language opened up an overlapping but different portion of the Reservation for sale. Congress plainly understood that the 1872 Act did *not* diminish the Reservation: in considering the 1882 Act, Congress described the lands opened in the 1872 Act as being subject to all tribal rights; provided for allotment of such lands; and altered the portion of the Reservation to be opened, retaining some of the 1872 Act lands within the area not opened for sale. The legislative history and surrounding circumstances thus confirm that the 1882 Act did not diminish the Reservation.

To the extent that subsequent circumstances are relevant, the evidence is mixed – with evidence sometimes showing the federal and state governments' understanding that the Reservation was diminished and sometimes not. This ambiguous record, on this least significant factor, must be resolved in favor of the Tribe and does not trump the statutory language

11

and legislative history. Accordingly, the district court correctly held that the 1882 Act did not diminish the Reservation.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo, applying the same standards that the district court applied. *See Yankton Sioux Tribe v. U.S. Army Corps of Engineers*, 606 F.3d 895, 898 (8th Cir. 2010).

## ARGUMENT

### I. THE 1882 ACT DID NOT DIMINISH THE OMAHA RESERVATION

Congress has plenary powers over Indian affairs, "including the power to modify or eliminate tribal rights." *Yankton Sioux*, 522 U.S. at 343. Thus, "only Congress can alter the terms of an Indian treaty by diminishing a reservation." *Id.* (citing *United States v. Celestine*, 215 U.S. 278, 285 (1909)). And, as the Supreme Court has most recently declared, for a statute to be deemed to have diminished a reservation, "[Congress's] intent to do so must be 'clear and plain.'" *Id.* at 343-344 (quoting *United States v. Dion*, 476 U.S. 734, 738-739 (1986)). Therefore, "[o]nce a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." *Solem*, 465 U.S. at 470.

12

In determining whether a reservation has been diminished, Supreme Court precedents have established "a fairly clean analytical structure, * * * directing [courts] to look at three factors." *Hagen v. Utah*, 510 U.S. 398, 410-411 (1994). First, a court must look to "'the statutory language used to open the Indian lands.'" *Yankton Sioux*, 522 U.S. at 344 (quoting *Hagen*, 510 U.S. at 411). The statutory language is the "'most probative evidence of diminishment.'" *Id.* Thus, for a court to find diminishment, "[t]he statutory language must 'establis[h] an express congressional purpose to diminish.'" *Hagen*, 510 U.S. at 411 (quoting *Solem*, 465 U.S. at 475).

Second, a court may look to "the historical context surrounding the passage of the surplus land Acts," including the legislative history. *Yankton Sioux*, 522 U.S. at 343. In the absence of explicit statutory language showing an express congressional purpose of diminishment, this second factor may support a finding of diminishment "[w]hen events surrounding the passage of [the statute] unequivocally reveal a widely-held, contemporaneous understanding" of Congress's intent to diminish the reservation. *Solem*, 465 U.S. at 471; *see also Hagen*, 510 U.S. at 423.

Third, a court may look, "to a lesser extent," to "the subsequent treatment of the area in question and the pattern of settlement there" to the extent that these considerations provide "additional clue[s] as to what

13

Congress expected." *Yankton Sioux*, 522 U.S. at 343 & 356 (internal quotations and citation omitted); *see Hagen*, 501 U.S. at 411 (demographics are "'also relevant to deciding whether a surplus land Act diminished a reservation'") (quoting *Solem*, 465 U.S. at 471). But if "both an act and its legislative history fail to provide substantial and compelling evidence of congressional intention to diminish Indian lands, [courts] are bound * * * to rule that diminishment did not take place and that the old reservation boundaries survived the opening." *Solem*, 465 U.S. at 472.

"Throughout this inquiry," a court must "resolve any ambiguities in favor of the Indians" and "will not lightly find diminishment." *Yankton Sioux*, 522 U.S. at 344. This general rule – that "legal ambiguities are resolved to the benefit of the Indians" – is given "the broadest possible scope" in diminishment cases. *DeCoteau*, 420 U.S. at 447.

The Supreme Court has applied this analysis in seven cases to determine whether federal statutes providing for disposal of certain lands on Indian reservations diminished reservation boundaries. These cases provide the most authoritative case law pertaining to diminishment, and we rely on them throughout this brief.

In four cases, the Supreme Court held that the statutes in question *did* diminish the reservations. These cases are:

14

(1) *Yankton Sioux*, holding that a 1904 statute diminished the Yankton Sioux Reservation in South Dakota;

(2) *Hagen*, holding that a 1902 statute diminished the Uintah Indian Reservation in Utah;

(3) *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584 (1977), holding that statutes enacted in 1904, 1907, and 1910 diminished the Rosebud Sioux Reservation in South Dakota; and

(4) *DeCoteau*, holding that an 1891 statute diminished the Lake Traverse Indian Reservation in South Dakota.

In three cases, the Supreme Court held that the statutes *did not* diminish the reservations; these cases are:

(1) *Solem*, holding that a 1908 statute did not diminish the Cheyenne River Sioux Reservation in South Dakota;

(2) *Mattz v. Arnett*, 412 U.S. 481 (1973), holding that an 1892 statute did not diminish the Klamath River Reservation in California; and

(3) *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351 (1962), holding that a 1906 statute did not diminish the Colville Indian Reservation in Washington State.

As set forth below, and as correctly determined by the district court, the application of these legal standards to the 1882 Act identifies no "clear

15

and plain" congressional intent to diminish the Omaha Reservation. First, the plain language of the Act fails to establish an "express congressional purpose to diminish" when compared with the statutory language that the Supreme Court has construed in other diminishment cases and with the language in the 1854 and 1865 Omaha treaties. Second, the historical context of the 1882 Act confirms Congress's lack of intent to diminish, because it was enacted against the background of the 1872 statute, which contained functionally identical operative language but which– as the parties agree – plainly did *not* diminish the Reservation. And third, to the extent it may be relevant here, the evidence on the subsequent treatment of the opened area is mixed and does not provide a basis for finding diminishment.

### A. The plain language of the 1882 Act demonstrates Congress did not intend to diminish the Omaha Reservation.

By its terms, the 1882 Act did not diminish the Omaha Reservation. First, it contains none of the statutory language that the Supreme Court has found to support a finding of diminishment – cession of lands, their restoration to the public domain, or a fixed, sum-certain payment for such cession. Second, and in contrast, it contains language functionally identical to that in the statutes the Supreme Court has found *not* to diminish a

16

reservation; that is, it merely opened the Reservation to settlement with payment to come only from settlers who might purchase the land. Third, its terms contrast starkly with the cession and fixed-sum payment language contained in two prior treaties ratified by Congress which *did* reduce the Tribe's territory and the Reservation, indicating that both Congress and the Tribe understood how to effectuate a diminishment but in the 1882 Act intended a different result.

<blockquote>

**1.    The 1882 Act lacks language demonstrating congressional intent to diminish, including language that the Supreme Court has found to demonstrate diminishment.**

</blockquote>

As set forth below, in every case in which the Supreme Court has found that a reservation was diminished – *Yankton Sioux*, *Rosebud Sioux*, *DeCoteau*, and *Hagen* – the Court at a minimum identified express statutory support for diminishment. It found such language primarily in the operative provisions of the statutes opening the lands for settlement, which provided either that the Tribe "cede" and/or "relinquish" to the United States all "right" or "title" in the opened lands or, in *Hagen*, that the lands would be "restored to the public domain." The Supreme Court also found support in the manner of recompense to the tribe: where tribes have agreed to cede their lands, the Court has found diminishment only where the United States guaranteed in the statute a fixed, sum-certain payment for

17

the lands. The 1882 Act, in contrast, contains none of this language. Not surprisingly, therefore, Plaintiffs concede that the express language of the 1882 Act "does not incorporate terms which the Supreme Court has previously identified as hallmark diminishment language." Beverage Retailers Br. 42; *see* State Br. 7.

### a. The 1882 Act does not cede or relinquish any right, title, or interest of the Tribe.

In *Yankton Sioux*, *Rosebud Sioux*, and *DeCoteau*, the Supreme Court found support for a finding of diminishment in the statute's operative language providing that the relevant tribe would "cede" "to the United States" "all their claim, right, title, and interest" in the lands in question. *See Yankton Sioux*, 522 U.S. at 344-345 (tribe will "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest"); *Rosebud Sioux*, 430 U.S. at 591 n.8, 594 n.15 (statute effectuates agreements in which tribe will "cede, surrender, grant, and convey to the United States all their claim right, title, and interest"); *DeCoteau*, 420 U.S. at 439 n. 22, 441 (tribe will "cede, sell, relinquish, and convey to the United States all their claim, right, title and interest").[5]

---

[5] Even such statutory text has not, without more, provided a basis for a finding of diminishment. In *Rosebud Sioux*, for example, the Court premised diminishment on a 1904 statute that included language of cession

*Cont.*

18

Appellate Case: 14-1642     Page: 27     Date Filed: 07/08/2014 Entry ID: 4172819

The 1882 Act contains no such language. It does not provide that the Tribe will cede, sell, relinquish, grant, surrender, or convey any land. It does not convey any land to the United States. It does not relinquish any claim, right, title, or interest in land. It merely authorizes Interior to open the lands to settlement, which neither the courts, nor the parties to this suit, have ever suggested is sufficient to support a finding of diminishment. Thus, *Yankton Sioux, Rosebud Sioux,* and *DeCoteau* provide no support for a finding of diminishment here.

### b. The 1882 Act did not restore Omaha Reservation lands to the public domain.

In *Hagen,* the fourth case in which the Supreme Court found a reservation to be diminished, the statute lacked any language of cession. The operative provision opening reservation lands to settlement did provide, however, that the land "shall be restored to the public domain." *Hagen*, 510 U.S. at 404. The Court had previously determined that a passing statutory reference to reservation land opened to settlement as "public domain" was insufficient to find diminishment. *Solem*, 465 U.S. at 475. But in *Hagen*, the Court concluded that, because the statute in

---

*in conjunction* with the parties' express intent to effectuate an earlier 1901 agreement between the tribe and the United States, which included a payment of sum certain and, if ratified, would have diminished the reservation. 430 U.S. at 587, 590-91, 596-601.

Appellate Case: 14-1642    Page: 28    Date Filed: 07/08/2014 Entry ID: 4172819

question declared that the lands were "restored" to the public domain, and did so in the operative provision opening the reservation to settlement, the statute evinced a congressional intent to treat the lands as public lands, which is inconsistent with the continuance of reservation status. *Id.*; *see also DeCoteau*, 420 U.S. at 446 (noting significance of statutory language providing for return of land to public domain).

The 1882 Act contains *no* language restoring the opened lands to the public domain or otherwise referring to them as such anywhere in the statute. To the contrary, the Act's plain language affirmatively demonstrates Congress's understanding that the opened area was *not* public land. In contrast to every other statute opening a reservation to settlement that the Supreme Court has considered, the 1882 Act does not open the Omaha Reservation lands for "homesteading" but rather simply for "settlement under such rules and regulations as [the Secretary of the Interior] may prescribe."[6] 22 Stat. 341, § 2. And rather than providing for homestead patents, the Act provides that "patents shall be issued *as in the*

---

[6] Even the statutes that the Court concluded did *not* diminish a reservation provided for disposal of the lands within the reservation under the homestead laws. *See Solem,* 465 U.S. at 464; *Mattz*, 412 U.S. at 495; *Seymour*, 368 U.S. at 354-355.

20

*case* of public lands offered for settlement under the homestead and preemption acts." *Id.* § 4 (emphasis added).

Because the language "as in the case" of public lands would be unnecessary if the lands to be settled on were, in fact, already public lands, it must be interpreted to mean that the status of the reservation lands was unchanged by the 1882 Act. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (declining to "treat statutory terms as surplusage"). This interpretation is confirmed by an Interior Secretary ruling in 1900, which concluded that settlers who purchased land west of the right-of-way were not subject to homestead legislation because they were settled on lands "in the Omaha reservation." APP142. In addition, the 1882 Act allowed tribal members to select allotments west of the right-of-way simultaneously with the area being opened to settlement, which is inconsistent with a conclusion that the lands had lost their reservation status. *See Solem*, 465 U.S. at 474 ("individual allotments of the affected portion of the reservation before the land was officially opened to non-Indian settlers" suggested that the opened area was to remain a part of the reservation); *Mattz*, 412 U.S. at 497 (allotment to Indian individuals and families "completely consistent with continued reservation status"). Thus *Hagen* provides no support for a finding of diminishment here.

Appellate Case: 14-1642    Page: 30    Date Filed: 07/08/2014 Entry ID: 4172819

### c. The 1882 Act, enacted with the Tribe's agreement, does not provide a sum certain or *any* guaranteed payment to the Tribe.

The Supreme Court has also found the method of payment to a tribe relevant to the diminishment analysis. The statutes at issue in *Yankton Sioux* and *DeCoteau* resulted from negotiated agreements in which the tribe agreed to cede certain lands in exchange for a sum-certain payment by the United States. *See Yankton Sioux*, 522 U.S. at 338; *DeCoteau*, 420 U.S. at 437-441. In each case, the tribe specifically negotiated a sales price it considered acceptable: $600,000 in *Yankton Sioux,* 522 U.S. at 337-338, and $2,203,000 in *DeCoteau,* 420 U.S. at 441. In these cases, the Court found it relevant that there was "an unconditional commitment" from Congress to compensate the Indian tribe for its opened land; such that, when combined with "explicit language of cession," a nearly insurmountable presumption of diminishment arose. *Yankton Sioux*, 522 U.S. at 344.

In the two other cases finding diminishment, *Hagen* and *Rosebud Sioux*, Congress did not provide a sum certain to the Tribe. But, in contrast to *Yankton Sioux and DeCoteau*, in each of these cases, the relevant statutes were enacted over the tribes' protests. In *Rosebud Sioux*, the tribe had agreed to cede its land for a fixed payment (of $1,040,000), but

22

Congress did not approve the agreement, determining instead that the tribe would receive funds only as they were received from settlers – a proposal that the tribe refused to approve. 430 U.S. at 592. In *Hagen*, the tribe refused to cede its lands at all. In each of these cases, Congress unilaterally opened the reservation, with no payment for the lands from the United States, over the objections of the tribe. The Supreme Court nevertheless found the language ceding the lands or restoring them to the public domain, together with other indications that Congress had always intended to obtain such cession, to demonstrate Congress's intent to diminish.

Here, the 1882 Act did not make a fixed payment to the Omaha Tribe for its lands; instead, as agreed by the Tribe, it would be paid as sales were made. The Supreme Court has never found diminishment in these circumstances. Rather, as set forth below, the Court has consistently concluded that tribes are not deemed to have negotiated away all rights in their territory in exchange for an uncertain future return from future land sales. That conclusion applies with particular force here, as the Omahas were well aware of the 1872 Act's failure to accomplish the sales it had envisioned. The lack of a sum-certain payment here weighs heavily against diminishment.

Appellate Case: 14-1642    Page: 32    Date Filed: 07/08/2014 Entry ID: 4172819

### 2. The 1882 Act language is functionally identical to the hallmark language in statutes the Supreme Court has found *not* to effect diminishment.

Not only does the 1882 Act contain *none* of the operative language found in statutes that the Supreme Court has found to diminish a reservation; it in fact contains language that is functionally identical to the critical language in the statutes in *Solem, Mattz*, and *Seymour* that the Court held did *not* diminish the reservations.

First, unlike the statutes at issue in *Yankton Sioux, Hagen, Rosebud Sioux*, and *DeCoteau*, the statutes in *Solem, Mattz*, and *Seymour* each merely provided for the sale or disposal of lands to settlers and contained no language of cession or restoration of lands to the public domain. *See Solem*, 465 U.S. at 472 (Secretary is "authorized and directed * * * to sell and dispose of all that portion" of the reservation as described therein to "be disposed of by proclamation under the general provisions of the homestead laws"); *Mattz*, 412 U.S. at 495 (all lands in the reservation "are hereby declared to be subject to settlement, entry, and purchase under the laws of the United States granting homestead rights"); *Seymour*, 368 U.S. at 354-356 (Secretary "is authorized and directed * * * to sell or dispose of unallotted lands" in the reservation which "shall be open to settlement and entry under the provisions of the homestead laws") (interpreting Act of

24

March 22, 1906, ch. 1126, 34 Stat. 80-81)). The Supreme Court has characterized such statutes as being "[a]t the other extreme" on the spectrum of surplus land acts from those that provide for cession of lands and a sum-certain payment. *Solem*, 465 U.S. at 469 n.10, 470-471.

Like the statutes in *Solem*, *Mattz*, and *Seymour*, the 1882 Act "authorize[s]" the Secretary "to cause to be * * * sold, all that portion of [the Tribe's] reservation" as identified therein, pursuant to a "proclamation" by the Secretary "to the effect that unallotted lands are open for settlement." 22 Stat. 341. As the Supreme Court has repeatedly explained, the opening of a reservation to settlement, without more, does not indicate a congressional intent to diminish. *E.g., Rosebud Sioux*, 430 U.S. at 586-587 ("The mere fact that a reservation has been opened to settlement does not necessarily mean that the opened area has lost its reservation status.") (citation omitted).

In addition, the statutes in *Solem*, *Mattz*, and *Seymour* – like the 1882 Act – provided no fixed sum or any guaranteed payment to the tribe for the lands. Rather, those statutes – just like the 1882 Act – merely required that proceeds of land sales would be deposited in the Treasury for the tribes' benefit. The Supreme Court recognized that, in contrast to the fixed payment provided in other statutes, compensating a tribe only with

25

such proceeds would yield a benefit to the tribe based only on "uncertain" sales of its lands. *DeCoteau*, 420 U.S. at 448. Such an uncertain return is inconsistent with a conclusion that a tribe relinquished all of its rights in the opened territory, as tribes would have expected to receive a certain and substantial return for the complete divestment of their reservation – just as the tribes *did* so expect (with varying result) in the four cases where diminishment occurred.

Under this precedent, the 1882 Act cannot be read to have diminished the Omaha Reservation boundaries. As the Supreme Court has explained, a statute's "reference to the sale of Indian lands, coupled with the creation of Indian accounts for proceeds, suggests that the Secretary of the Interior was simply being authorized to act as the Tribe's sales agent." *Solem*, 465 U.S. at 473. Such provisions "d[o] no more than to open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards." *Seymour*, 368 U.S. at 356. That is exactly what the 1882 Act did with respect to the Omaha Reservation.

Appellate Case: 14-1642    Page: 35    Date Filed: 07/08/2014 Entry ID: 4172819

### 3. The 1882 Act language starkly contrasts with the language of the 1854 and 1865 treaties that *did* diminish the Omaha Reservation boundaries.

The 1854 and 1865 treaties with the Omaha Tribe, ratified by Congress, demonstrate that both Congress and the Tribe knew what language to use to divest the Tribe of its sovereign rights over its territory or the Reservation. Both treaties contained the key features that the Supreme Court has found to diminish a reservation. In the 1854 Treaty, the Tribe agreed to "cede to the United States" and "forever relinquish all right and title" to certain lands; in the 1865 Treaty, the Tribe agreed to "cede, sell, and convey to the United States" the lands at issue there. In the 1854 Treaty, the United States agreed to pay the Tribe $840,000 over 40 years; in the 1865 Treaty, it agreed to pay $50,000 outright. 10 Stat. 1044, Art. 4; 14 Stat. 667, Art. 1. These treaties thus provided for an express cession of land to the United States in exchange for the payment of a sum certain, just like the statutes in *Yankton Sioux* and *DeCoteau* that the Court found to diminish the relevant reservations.

The "contrast between the provisions" of the 1854 and 1865 treaties and the 1882 Act "is particularly illuminating." *Duncan Energy Co. v. Three Affiliated Tribes of the Fort Berthold Reservation*, 27 F.3d 1294, 1297 (8th Cir. 1994). The 1882 Act contains no cession language, no

27

conveyance to the United States, and no sum-certain payment. The 1882 Act, enacted with the Tribe's agreement, must be construed in light of the parties' past history – of which they would have been well aware, as the operative provisions for disposing of reservation lands were first set forth in the 1872 Act, enacted just seven years after the 1865 Treaty. It would be unreasonable to conclude that the Tribe and Congress intended the 1882 Act's entirely different language to achieve the same result as the 1854 and 1865 treaties. And such a construction is particularly untenable in a diminishment case. As this Court has recognized, "It would be contrary to the principle of resolving ambiguities in favor of the Indians were we to conclude that Congress intended the same meanings for the vastly different language employed in these two documents affecting the Tribe." *Id.*; *see also Seymour*, 368 U.S. at 355 (contrasting earlier act that restored lands to public domain with subsequent act that merely opened land for sale and disposal).

### 4. Plaintiffs' contrary arguments are unpersuasive.

Plaintiffs conceded in the district court that "the most probative factor to be examined in a diminishment inquiry – statutory language – does not work in their favor." Op. 34 (APP247). And in those proceedings, they identified nothing in the statute itself that supports a finding of

28

diminishment. Their attempts to find such support for the first time on appeal fail.

In an effort to force the 1882 Act into the *Hagen* box, the Beverage Retailers contend (Br. 43-44) that the fact that the 1882 Act did not provide a mechanism for the Tribe to retain tribal common land on the western side of the railroad demonstrates that Congress "meant to no longer treat the land west of the right of way as part of the Omaha Reservation" and that the "western land was, in fact, for practical purposes returned to the public domain." The Beverage Retailers fail to acknowledge that the 1882 Act's provision allowing land west of the right-of-way to be allotted to tribal members is flatly inconsistent with the land being in public domain status – as their own expert recognized. *See* APP2335. Moreover, it is unsurprising that the tribal common land was not planned to extend into the western area. The Tribe plainly wanted to retain its traditional ties to lands on the eastern side of the railroad, as proximity to the Missouri River and the tribal villages and farms established nearby was a necessity for the Tribe. APP2181-2183, 2193-2194.

The State, in turn, contends (Br. 7) that the statutory language "contemplating the issuance of patents to settlers and the indefinite period of time for which Congress opened the land west of the right-of-way for

Appellate Case: 14-1642    Page: 38    Date Filed: 07/08/2014 Entry ID: 4172819

settlement * * * suggests that diminishment was the intent." The State provides no legal or logical support for this conclusion – nor can it, as the argument is at odds with the Supreme Court's diminishment case law. It is well established that "[t]he opening of an Indian reservation for settlement by homesteading is not inconsistent with its continued existence as a reservation." *City of New Town v. United States*, 454 F.2d 121, 125 (8th Cir. 1972); *see also Rosebud Sioux*, 430 U.S. at 586-587. The Supreme Court held in *Solem*, *Mattz*, and *Seymour* that statutes authorizing homesteading, even if they allow for non-Indian settlement over an indefinite period of time, do not result in a diminishment. Moreover, the State does not explain why these provisions demonstrate an intent to diminish: the purpose of surplus lands acts is, by definition, to dispose of those lands. But as the Supreme Court explained in *Solem*, "Although the Congresses that passed the surplus land Acts anticipated the imminent demise of the reservation and, in fact, passed the Acts partially to facilitate the process, we have never been willing to extrapolate from this expectation a specific congressional purpose of diminishing reservations with the passage of every surplus land act." 465 U.S. at 468-69.

Appellate Case: 14-1642     Page: 39     Date Filed: 07/08/2014 Entry ID: 4172819

Plaintiffs did not argue in the district court that the 1882 Act's language evidenced an intent to diminish the Omaha Reservation boundaries, and their attempts to do so here are unavailing.

### B. The historical context and legislative history of the 1882 Act do not demonstrate an unambiguous intent to diminish.

In *Hagen*, the Supreme Court cautioned that its cases did not establish a "clear-statement rule." But it did declare that "the statutory language must establish an express congressional purpose to diminish," and found such language present in that case. 510 U.S. at 411 (internal quotations and citation omitted). In this case, as demonstrated above, the language of the 1882 Act establishes no such purpose.

However, dicta in *Yankton Sioux* – a case in which the statute contained language of cession and sum-certain payment – could be interpreted to have relaxed the *Hagen* rule. The Court, however, set a very high standard for doing so. Specifically, the Court stated that "[e]ven in the absence of a clear expression of congressional purpose to diminish in the text of a surplus land Act, *unequivocal evidence* derived from the surrounding circumstances may support the conclusion that a reservation has been diminished." 522 U.S. at 351 (citing *Solem*, 465 U.S. at 471) (emphasis added). Such unequivocal evidence exists where surrounding

31

circumstances "unequivocally reveal a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation." *Solem*, 465 U.S. at 471.

No unequivocal evidence of intent to diminish exists here. To the contrary, as set forth below, the 1872 Act – which Plaintiffs contend provides the most significant historical context for the 1882 Act – conclusively demonstrates that Congress did *not* intend for the 1882 Act to diminish the Reservation. As to the legislative history, it is ambiguous at best; moreover, the legislative history on which Plaintiffs primarily rely was based on a version of the bill that was almost entirely rewritten before enactment. And the executive reports on which Plaintiffs rely are largely based on a misunderstanding of the 1872 Act, and thus fail to support a congressional intent to diminish.

> **1.** **The 1872 Act supports a finding that the 1882 Act did not diminish the Omaha Reservation.**
>
> **a.** **The 1872 Act's operative language is functionally indistinguishable from that of the 1882 Act.**

Congress first provided for the sale of lands on the western side of the Omaha Reservation in the 1872 Act. That Act addressed sales on three additional reservations as well, and was intended to provide financial relief for all of the specified tribes. *See* 17 Stat. 391 (title of the Act). The portion

32

of the Act addressing the Omaha Reservation stated that the Tribe had consented to the sale; authorized a survey; provided for an appraisal by three commissioners, including one appointed by the relevant tribe; authorized the Secretary to sell the land under procedures established therein; and provided for proceeds of the sales to be placed in a Treasury account to the credit of the Tribe. *Id.* The other three sections pertaining to three different reservations contained identical provisions, and incorporated by reference the sale procedures set forth in the Omaha portion of the Act. *Id.* at 391-392 §§ 2-4.

The operative provisions of the 1872 Act are thus functionally identical to the 1882 Act, which likewise provided for survey, appraisal, and sale of reservation lands with the receipts to be deposited in the Treasury for the Tribe's benefit. Given this near match of language, addressing similar subject matter, the two statutes should be interpreted consistently with each other. *See, e.g. United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir. 2007) (*en banc*) (citing *Metro Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)). And, because the 1872 Act did not diminish the Reservation boundaries, neither did the 1882 Act.

Appellate Case: 14-1642    Page: 42    Date Filed: 07/08/2014 Entry ID: 4172819

**b.** **The language and legislative history of the 1882 Act demonstrate that the 1872 Act did not diminish the Reservation.**

It is undisputed that the 1872 Act did not diminish the Reservation. The Beverage Retailers' expert expressly so stated, *see* APP1376, and Plaintiffs themselves do not contend otherwise. *See* Beverage Retailers Br. 35-38 (1872 Act provides context for 1882 Act); State Br. 2. Moreover, it is evident in the congressional proceedings on the 1882 Act, and in the Act itself, that Congress did not view the 1872 Act as having altered the status of the western portion of the Reservation.

In debating the 1882 Act, Congress was aware of the 1872 Act. *See, e.g.* 13 Cong. Rec. H6539 (July 26, 1882); s*ee also Yankton Sioux*, 522 U.S. at 351 (courts "assume that Congress is aware of existing law when it passes legislation") (quotations and citation omitted). Yet the legislators repeatedly referred to the western area as "a portion of the reservation" or as the lands coming from the "total reservation," and they recognized that "the Omaha Indians have the whole reservation" and that "any Indian may go upon any part of the whole reservation and occupy" it. *See* 13 Cong. Rec. S3077 (April 29, 1882); *id.* at 3078 ("the Indians have by treaty this reservation now" and "have a right to go upon any part of it"); 13 Cong. Rec. H6538 (July 26, 1882). The legislators also understood that they could still

34

allocate the lands opened for sale in the 1872 Act to the Indians in the 1882 Act, to the point of debating whether Congress should allow the Tribe to keep the better agricultural lands in the western portion of the Reservation and sell the eastern lands instead. *Id.* at H6540-6541.

The 1882 Act also includes provisions that would be flatly inconsistent with a conclusion that the 1872 Act diminished the Reservation. The 1882 Act provided for a different demarcation of the area where the lands were to be sold, replacing the north-south line along the sections described in the 1872 Act with the northwest-southeast diagonal line of the railroad right-of-way. The railroad right-of-way necessarily bisected that north-south line, so that some of the lands opened for sale in the 1872 Act were no longer available for sale in the 1882 Act, and vice versa.[7] Thus, the Beverage Retailers are wrong when they state (Br. 48) that "the 1882 Act did not change the fact that the 1872 Act had separated the western portion." With the 1882 Act's redefinition of the point of

---

[7] The record does not show where the north-south line along the sections was established pursuant to the 1872 Act but, because a section is 640 acres, it would take approximately 78 sections to yield the 50,000 acres sought to be sold. As the western part of the Reservation is 10 sections in length from north to south, that would place the line approximately eight sections in from the west. That would place it at the divide between Range 6 East and Range 7 East, which clearly bisects the railroad right-of-way. *See* APP 308 (map of Reservation with right-of-way and section and range lines).

Appellate Case: 14-1642    Page: 44    Date Filed: 07/08/2014 Entry ID: 4172819

demarcation, the two statutes' sales provisions covered different land areas, so that the first was necessarily negated by the second. Most significantly, Congress added language in Section 8 of the Act clarifying that tribal members could select their allotments on the west side of the railroad in the opened territory. Omaha tribal members would not have been able to take allotments "in any part of said reservation either east or west of [the] right of way" if that area was no longer within the Reservation.

Congress's plain understanding that the 1872 Act did not diminish the Reservation, together with the 1882 Act's provisions that are incompatible with prior diminishment of the Reservation, irrefutably demonstrates that the functionally identical provisions of the 1882 Act *also* did not diminish the Reservation. Indeed, to the extent that the 1882 Act differs from the 1872 Act, it weighs further against diminishment, because the 1882 Act authorized the selection of tribal member allotments in the opened area, which is incompatible with a finding of diminishment.[8]

---

[8] One distinction between the two acts is that the 1872 Act authorized the Secretary to sell the lands without requiring their settlement, while the 1882 Act allowed for the sale of lands only to bona fide settlers. This requirement was added in the House version of the statute, which substantially rewrote the Senate version, and was responsive to concerns that the lands not be sold to speculators. *See* 13 Cong. Rec. H6537-6542 (July 26, 1882).

Appellate Case: 14-1642    Page: 45    Date Filed: 07/08/2014 Entry ID: 4172819

### c. Plaintiffs' contentions that the 1872 Act supports a finding of diminishment are wrong.

The Beverage Retailers contend (Br. 9, 37-38) that the 1872 Act indicates a congressional intent to diminish because (1) it characterized the western part of the Reservation as being "separated" from the rest of the Reservation; (2) Interior officials referred to the 1872 Act as "diminishing" the Reservation; and (3) Interior described the Reservation as reduced in acreage after the 1872 statute was enacted. *See also* State Br. 8. None of these arguments can overcome the fact that the 1872 Act did *not* – as we have shown and they concede – diminish the Reservation. In any event, these arguments are not persuasive.

The Beverage Retailers first rely (Br. 36-37) on the 1872 Act's provision for the survey of 50,000 acres of a portion of the Reservation "to be taken from the western part thereof, and *to be separated from the remaining portion of said reservation* by a line running along the section lines from north to south." 17 Stat. 391. They argue (Br. 37) that the use of the term "separated" is "powerful" because it was not used when authorizing sales of land from other tribes' reservations in the 1872 Act.

Plaintiffs misconstrue the use of the term "separated" in the 1872 Act and provide no support for the proposition that Congress intended to treat

37

the Omaha Reservation any differently from the other reservations opened for sale in that Act. The statutory language addressing each of the four reservations in every other relevant respect is identical; in fact, the sale procedures in the Omaha portion of the statute are incorporated by reference in the sections addressing the other reservations. *Id.* at 392 §§ 2-4. When examined in context, the most reasonable interpretation of the word "separated" is that it was used simply to delineate the area to be opened for sale. Such a "separation" was unnecessary with respect to the other reservations covered by the Act because, for two of them, the area to be sold was in fact physically separated by rivers, and thus was described as "lying south" and "lying west" of the specified rivers, respectively. *Id.* §§ 2 and 3. As to the fourth reservation included in the Act, the statute merely authorized sale of "a portion or the whole of the reservation," without specifying where the sale would occur if only a portion of the reservation were sold. *Id.* § 4. The 1872 Act simply used language to identify the geographical location of the areas opened for each of the four reservations, and intended the same result with each. Placing a completely different construction on the meaning of "separated" as used in the 1872 Act to identify the opened area of the Omaha Reservation as compared with the

Appellate Case: 14-1642    Page: 47    Date Filed: 07/08/2014 Entry ID: 4172819

other three reservations is more meaning than the word "separated" can bear.

In any event, Congress did *not* use the word "separated" when it identified the land to be sold in the 1882 Act. Instead, with the railroad right-of-way providing a delineating feature, Congress used the same language it had used for the other reservations in the 1872 Act: in the 1882 Act, Congress identified the land to be sold as "lying" west of the right-of-way. This further suggests that the word "separated" carries no independent significance. But assuming the word "separated" in the 1872 Act *did* have the meaning that Plaintiffs ascribe to it, its omission from the 1882 Act would demonstrate Congress's intent *not* to carry that meaning into the 1882 statute. *See Johnson v. United States,* 529 U.S. 694, 710 (2000) (it is reasonable to look to identifiable predecessor when construing subsequent statute).

Plaintiffs' reliance on Interior's characterization of the 1872 Act as diminishing the Reservation also fails. Historical use of language such as "reduced reservation[s]" or "reservations as diminished" is not determinative in present-day legal diminishment analysis. Such language may refer either to "the reduction in Indian-owned lands that would occur once some of the opened lands were sold to settlers or to the reduction that

39

a complete cession of tribal interests in the opened area would precipitate."
*Solem*, 465 U.S. at 478; *see also id.* at 475 n.17. This Court has recognized that rule. See *Lower Brule Sioux Tribe v. South Dakota*, 711 F.2d 809, 819 (8th Cir. 1983) (holding that the phrase "as diminished" had "nothing to do with the location of reservation boundaries" and fell short of clear intent). In *Solem*, both the Senate and House reports referred to a "reduced reservation" and to "reservations as diminished." 465 U.S at 478 (citations omitted). Even the statute itself referred to the reservation as "thus diminished," and to certain parts of the opened lands as "part of the public domain." *Id.* at 474-475. Yet the Supreme Court held that these statements did not constitute clear Congressional intent to diminish reservation boundaries.

Furthermore, Interior characterized *all* of the reservations in the 1872 Act as being diminished, APP134, even though the Act did not describe the lands opened for sale in the other reservations as being "separated" – thus further suggesting that Plaintiffs' argument that the 1872 Act treated the Omaha Reservation differently is wrong. But most importantly, because we have demonstrated that Congress clearly understood that the 1872 Act did *not* diminish the Reservation, any statement by Interior otherwise was of no effect – and, as a legal matter, the 1872 Act contained none of the indicia

40

required today to find that a statute diminished reservation boundaries. The same reasoning applies to the Interior reports characterizing the 1872 Act as reducing the Reservation by some 50,000 acres: Congress did not consider it reduced, and in the 1882 Act, Congress re-delineated the area to be sold so as to place some of that acreage within the area *not* available for non-Indian settlement, provided for allotment of any of that acreage to Omaha tribal members, and provided that all unallotted land east of the railroad right-of-way – which included land within the 1872 Act's sale area – was to be patented to the Tribe.

Plaintiffs' arguments fundamentally fail to identify any mechanism by which the statutory language of either the 1872 or 1882 statutes restored the reservation land to the public domain or otherwise eliminated the reservation boundaries and status for the opened area. If the 1872 Act did not diminish the Reservation, as Plaintiffs concede it did not, the same language in the 1882 Act cannot have effectuated a diminishment. As such, their efforts to analogize the relationship between the 1872 and 1882 statutes to the relationship between the earlier and later statutes and/or agreements on which the Supreme Court partially relied in *Hagen* and *Rosebud Sioux* completely fails. In those cases, the Court reasoned that later statutes effectuated diminishment of reservation boundaries because

41

diminishment was plainly contemplated by the parties in earlier statutes or agreements that were not enacted or implemented. Here, in contrast, the 1872 Act *was* enacted and *did not* diminish the Reservation, so it could not imply an intent to diminish in the 1882 Act. This is especially true given that the 1882 Act contained similar language to that in the 1872 Act opening the Reservation for land sales, and demonstrates an intent to be *more* protective of the Tribe, such as by allowing tribal members to select allotments in the opened area. Thus, the relationship between the two statutes does not support diminishment but instead compels a conclusion that the 1882 Act did *not* diminish the Reservation.

### 2. The legislative history does not support a finding of diminishment.

As the district court correctly found, the legislative history does not address the question of the reservation's boundary or diminishment. Op. 40 (APP253). The Beverage Retailers rely (Br. 46-47) on two statements in the legislative history. But these statements are too small a fragment on which to base a finding of diminishment. Moreover, the cited statements fail to shed much light on the matter. One is a statement by Nebraska's Senator Saunders who described the lands to be opened as segregated and coming under the jurisdiction of the State. But the Senate version of the bill was almost entirely rewritten by the House, whose

42

version of the bill was ultimately passed. *See* Addendum (reproducing the engrossed Senate bill and House Committee revision). Among other things, the House version eliminated language in the Senate bill describing the western lands as "separated" from other reservation lands; changed the delineation of the portion of the Reservation available for sale (from a north-south line along the sections to west of the railroad right-of-way); and allowed tribal members to select allotments anywhere on the Reservation, including the western portion.[9] *Id.*; *see also* 13 Cong. Rec. H6541 (July 26, 1882).

The other statement is by Senator Dawes of Massachusetts, who expressed concern that the sale of the lands would leave the Reservation "too small." But, as noted above (pp. 39-40), it is often ambiguous whether such historical statements regarding the size of a reservation refer to the reduction in the lands held by the Indians or the size of a reservation measured by its boundaries. Here, in any event, Dawes clearly was addressing the acreage available to the Indians themselves, as he was concerned about whether the Indians would have enough land on which to obtain their allotments and farm. 13 Cong. Rec. S3032 (April 19, 1882).

---

[9] The State's reliance on Saunders' statements in 1880 (Br. 8) is unavailing for the same reason.

Appellate Case: 14-1642   Page: 52   Date Filed: 07/08/2014 Entry ID: 4172819

The Beverage Retailers also suggest (Br. 35-36) that it is important that the Omaha Tribe made little use of the western portion of the Reservation, chose no allotments there under the 1865 Treaty, and selected the western portion of the Reservation for sale when they urgently needed funds. They further contend (Br. 39-40) that the goal of the 1882 Act was not to integrate non-Indian settlers among the tribal members, but to segregate the Indians from non-Indians. But any inference that the Beverage Retailers draw from these pre-1882 Act circumstances are not supported by the statute or Congress's treatment of it. The Act was intended to provide relief for the Tribe, and as introduced it may not have anticipated that tribal members would settle in or otherwise use the area west of the right-of-way. But the statute was expressly *changed* to provide for allotments on both the western and eastern sides of the right-of-way and tribal members in fact did select allotments on the western side. 13 Cong. Rec. H6571-6572 (July 27, 1882); APP2236. Moreover, the legislative history evidences a serious concern for the welfare of the Omahas, with every change made in the language of the legislation designed to make the Act's provisions more favorable to them and to cure the failures of the 1872 Act, which did not provide them financial relief. Nothing supports a contrary conclusion that Congress in the 1882 Act completely stripped the

44

Tribe of some 50,000 acres of its territory with only the "uncertain" possibility of an unknown future financial return.

### C. Subsequent treatment of the area does not support a finding of diminishment.

In the third prong of the diminishment analysis, courts look, "[t]o a lesser extent," to events that occurred after the passage of a surplus land act. *Solem*, 465 U.S. at 471. However, subsequent history has been described as "less illuminating." *Hagen*, 510 U.S. at 420. And exclusive reliance on subsequent events to support a diminishment finding is "totally inappropriate." *Duncan Energy*, 27 F.3d at 1298. Indeed, where, as here, "both an Act and its legislative history fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands," courts are "bound by [their] traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening." *Solem,* 465 U.S. at 472 (citing *Mattz,* 412 U.S. at 505; *Seymour,* 368 U.S. 351).

In any event, the subsequent treatment of the area does not support a finding of diminishment here because the record is mixed, containing inconsistent and contradictory evidence from federal and state authorities as to whether they understood the Reservation to have been diminished. This evidence thus "carries but little force in light of the strong textual and

45

contemporaneous evidence" against diminishment. *Yankton Sioux*, 522 U.S. at 356 (internal quotation marks omitted); *see also Solem*, 465 U.S. at 478 (no diminishment where "[t]he subsequent treatment of the [reservation] by Congress, courts, and the Executive is so rife with contradictions and inconsistencies as to be of no help to either side"); *City of New Town,* 454 F.2d at 125-126 (inconsistent subsequent events do not impute congressional intent to diminish and "[w]e do not deem it necessary to examine these later acts in detail").

### 1. Subsequent treatment by Congress shows it did not understand the reservation boundaries to be diminished.

In subsequent legislation amending or modifying the 1882 Act, Congress demonstrated its understanding that the statute did not diminish the Reservation. *See Solem*, 465 U.S. at 471 (noting the evidentiary value of subsequent congressional enactments "particularly in the years immediately following the opening" of a reservation). This subsequent legislation consisted of five statutes enacted within the 12 years immediately following passage of the 1882 Act, in which – among other things – Congress postponed the 1882 Act's payments required from non-Indian settlers. In all five, Congress referred to the disputed area as the

46

"Omaha Indian Reservation" and/or "Omaha lands."[10] This suggests that the opened area remained a part of the Reservation. *See Solem*, 465 U.S. at 478-479 (bill passed two years after enactment of surplus land statute referring to "'lands *in the Cheyenne River Indian Reservation*,' suggest[s] that the opened area was still a part of the reservation") (citation omitted) (emphasis in opinion)).

Even more compelling are the clear references to the western lands as part of the Reservation in the present or future tense in two of these statutes, enacted in 1885 and 1886. The 1885 Act provided for the appraisal and sale of "that portion of *said reservation*" in township 24, the sale of which the 1882 Act had deferred until 1885. Act of March 3, 1885, ch. 341, 23 Stat. 362, 370 (emphasis added). The 1886 Act deferred payment for "all persons who have settled or *shall settle upon said Omaha lands*." Act of Aug. 2, 1886, ch. 844, 24 Stat. 214 (emphasis added). In addition, the 1894 Act required "the consent of the Indians" for the extension of payments,

---

[10] *See* Act of March 3, 1885, ch. 341, 23 Stat. 362, 370 (authorizing the Secretary to "appraise and sell * * * that portion of said reservation" for which the 1882 Act had delayed sale until 1885) (APP1095); Act of Aug. 2, 1886, ch. 844, 24 Stat. 214 (referring to settlers on "said Omaha lands")(APP2403); Act of May 15, 1888, ch. 255, 25 Stat. 150, § 2 (extending payments for "land sold on Omaha Indian Reservation") (APP2405); Act of August 19, 1890, ch. 803, 26 Stat. 329 (same) (APP 2408); Act of August 11, 1894, ch. 255, 28 Stat. 276 (same) (APP2414).

Appellate Case: 14-1642    Page: 56    Date Filed: 07/08/2014 Entry ID: 4172819

tying the Tribe directly to the lands 12 years after the 1882 Act was enacted. Act of August 11, 1894, ch. 255, 28 Stat. 276.

Appellants contend (Br. 44, 54) that, in the 1888 statute, Congress treated the area west of the right-of-way as not part of the Reservation because it provided for land on which a settler defaulted to be sold at public auction rather than to revert to the Tribe. But the purpose of the 1882 Act was to sell unallotted lands for the financial benefit of the Tribe. Such relief would be achieved by reselling the lands, not by returning them to the Tribe. To accomplish this goal, "the United States merely continued to act as trustee for the Tribe so the Tribe gained the financial benefit of the sale." Op. 44 (APP257).

### 2. Subsequent treatment by the federal government and the State does not support a finding that the Reservation was diminished.

Addressing subsequent treatment of the area by state and federal agencies, the district court found that the "Omaha Reservation has been described, treated, and mapped inconsistently by the State of Nebraska, its agencies, and the United States." Op. 45 (APP258). The court correctly concluded that such a mixed record is of limited interpretive value, carries little force, and cannot be considered dispositive of the diminishment

Appellate Case: 14-1642    Page: 57    Date Filed: 07/08/2014 Entry ID: 4172819

question. *See id.* (citing *Yankton Sioux*, 522 U.S. at 354-355; *Solem*, 465 U.S. at 478-479; and *Rosebud Sioux*, 430 U.S. at 604 n.27).

### a.    Treatment by Interior

Plaintiffs focus primarily on treatment of the Reservation by Interior. *See* Beverage Retailers Br. 54-57; State Br. 11. But Interior's record is inconsistent and inconclusive, and any early treatment of the Reservation as diminished would be unsurprising (albeit incorrect), given that Interior concluded that the 1872 Act itself diminished the Reservation, which we have shown (pp. 34-36) is plainly wrong, and which Plaintiffs themselves do not dispute.

In support of their contention that Interior viewed the 1882 Act as diminishing the reservation boundaries, the Beverage Retailers cite several subsequent Interior reports describing the Reservation as reduced in acreage, as well as statements primarily by federal Indian agents describing the Reservation as lying east of the railroad.[11] *See* Br. 54-55; *see also* State Br. 11. But because Interior viewed the Reservation as reduced in acreage *prior* to the 1882 Act, these *post*-1882 statements add no new information.

---

[11] It is immaterial that one statement referred to the disputed area as within the "former reservation" because references to all or part of a reservation in the "past tense" are insufficient to infer clear intent to diminish the reservation. *Mattz*, 412 U.S at 504.

Appellate Case: 14-1642     Page: 58     Date Filed: 07/08/2014 Entry ID: 4172819

*See* APP355 (Plaintiffs' expert report stating that "[o]fficial reports from 1874 onward consistently treated the Omaha Reservation as having been diminished by 50000 acres"). And, in any event, describing a reservation as reduced in acreage does not indicate that the boundaries were changed. *See supra* pp. 39-40.

Nor are the cited statements by Indian agents authoritative or consistent. In 1897 and 1899 reports, for example, Indian agents referred to the post-1882 Omaha Reservation boundary as extending west 30 miles, which describes the Reservation's undiminished southern boundary. APP2431, 2435; *see also* APP2420 (1885 report describing the Reservation as extending 25 miles west of the Missouri River, which extends beyond the right-of-way and may refer to the undiminished northern boundary) and APP308 (showing the undiminished Omaha Reservation as 30-miles wide across the southern boundary and 25-miles wide across the northern boundary; by contrast, the Winnebago Reservation in no place measures 30 miles wide).

In any event, Interior has determined on multiple occasions that the boundaries of the Omaha Tribe have not been diminished. This includes: (1) a 1961 historical summary by the Winnebago Agency stating that "later enactments [after the 1865 Treaty] authorizing the sale of various lands

50

included within these boundaries are not considered to have had the effect of terminating Federal jurisdiction over them," APP2349, 145-146; (2) a 1999 memorandum from the Aberdeen Area Director similarly finding that the reservation boundaries had not changed since 1865, APP2482; and (3) a 2008 27-page analysis by the Interior Field Solicitor examining the statute, legislative history, and surrounding circumstances to conclude that the 1882 Act did not diminish the Reservation, APP2556-2582. Most recently, in 2012, the Interior Associate Solicitor – Indian Affairs, in a thorough and authoritative memorandum, confirmed the correctness of the 2008 Field Solicitor's analysis. APP270-292.

The Beverage Retailers rely (Br. 56) on a map of the Omaha Reservation dated October 8, 1964, from the Aberdeen Area Office, which includes a note from an unknown author claiming that the Reservation was diminished.  APP1367. This document provides no authority: it contains no explanation for any finding of diminishment; the notation describes the purportedly diminished area differently from the area opened to settlement by the 1882 Act; and while the note describes the diminished boundary as located between two townships at ranges 6 and 7 east, it draws an arrow in a completely different place, between ranges 7 and 8 east.

Appellate Case: 14-1642     Page: 60     Date Filed: 07/08/2014 Entry ID: 4172819

The Beverage Retailers further rely (Br. 56-57) on the only Interior statement to the contrary, a 1989 letter from the Field Solicitor, which was factually and legally flawed – concluding that the Reservation was diminished despite its finding that "diminishment was not the intent of Congress." Interior has since disclaimed that analysis. *See City of New Town*, 454 F.2d at 123 (recognizing Solicitor's Office correction of earlier agency diminishment determination).

Finally, the State contends (Br. 11) that three Interior maps prepared in the late 1800s depicted the railroad right-of-way as forming the Omaha Reservation's western boundary. Each of these maps, prepared in 1883, 1888, and 1894, depicted the nation's some-150 reservations on a single, nationwide map. APP2657-2659. The State submitted these maps – which do not purport to show legal boundaries, and on which the Omaha Reservation is barely visible – during summary judgment briefing. In contrast, the parties' undisputed facts identify an 1884 map, drafted by federal cartographers working for the Office of Indian Affairs, specifically showing the "Boundary Lines of the Omaha and Winnebago Ind. Res. in Nebraska" and including the western area as part of the Reservation. APP154, 2474. In addition, Plaintiffs' expert herself authenticated an 1885

52

map, of unknown origin, that similarly shows the Omaha Reservation with its undiminished western boundary. *See* APP1355, 1360; APP308.

More recent federal maps also vary in their depiction of the Reservation. Compare APP 2481 and 2257 (1994 Bureau of Indian Affairs (BIA) map showing Thurston County portion of western area in the Reservation) with 2484-2486 (1995 and 1999 maps showing entire western area in the Reservation); *see also* APP151 (U.S. Census Bureau relying on 1999 BIA map showing Pender within the Reservation); *In re Circle T Feedlot, Inc.*, 2010 WL 3295104 (EPA Env. App. Bd. June 7, 2010) (citing in part BIA map for the proposition that BIA recognizes the western area to be within the Reservation).

### b.    Treatment by the State

Plaintiffs generally assert that the State has exercised jurisdiction over the lands west of the right-of-way, but there are numerous indicators that the State has frequently viewed the Reservation as undiminished.

First, from 1922 to the present, the Nebraska state legislature – by defining Thurston County's western boundary by reference to the western boundary of the Omaha Reservation as it existed in 1865 – has indicated its understanding that the 1882 Act did not diminish the Reservation. In 1889, when the legislature established the County, it described its western

53

boundary as running along a north-south line along certain sections, which closely coincided with (but did not exactly follow) part of the western boundary of the Omaha Reservation as established by the 1855 survey. *See* APP145 (quoting Compiled Statutes of Nebraska 1889, Chap. 17, § 75b) (describing western boundary as extending from (1) the northwest corner of section 2, township 26 north, of range 5 east, south to (2) the southeast corner of section 34, township 25 north, of range 5 east). The County thus included much of the portion of the Reservation opened to settlement.

In 1922, the legislature made slight revisions to the description of the county boundaries so that they *exactly* followed the 1855 reservation boundaries – including the western boundary, which actually deviated slightly from the section lines on which the prior description had relied. And in doing so, the legislature indicated that it understood that the 1855 western boundary remained intact, by describing it with express reference to the Reservation in the present tense. Specifically, the north end of the County's western boundary point was identified as beginning at the "intersection with the west boundary of [the] Winnebago Indian reservation" and proceeding "thence *south along the Winnebago and Omaha Indian reservation line*" to "a point where *the west boundary of the Omaha Indian reservation* intersects the south line of section thirty-three

54

(33), township twenty-five, north, range five, east." *Id.* (quoting Compiled Statutes of Nebraska 1922, Chap. 13, § 804) (emphasis added). In other words, by 1922, the State of Nebraska amended its own statutes in a manner that explicitly recognized the Omaha Reservation's undiminished boundary.[12] This recognition continues to this day. *See* Neb. Rev. St. § 22-187. That the western boundary of Thurston County coincides with the western boundary of the Omaha and Winnebago reservations means that Thurston County, in its entirety, is encompassed by these reservations. Indeed, as recently as May 2012, Thurston County's website acknowledged that "[t]he two reservations [Omaha and Winnebago] are still in existence today and cover the entire Thurston County area." APP2473 (emphasis added).

Second, the Nebraska legislature implicitly acknowledged the Omaha Reservation's undiminished western boundary pursuant to its "retrocession" of criminal jurisdiction over Indian country in Thurston County to the federal government in 1969. Congress had transferred civil

---

[12] While the statute had previously described the *southern* reservation boundary, which is not in dispute, as "the south line of the Omaha Indian reservation, *as originally surveyed*," *see* APP145, the amendment made no such distinction for the western boundary, indicating that the legislature understood the amendment to refer to the then-current western reservation boundary.

Appellate Case: 14-1642    Page: 64    Date Filed: 07/08/2014 Entry ID: 4172819

and criminal jurisdiction over Indian country in Nebraska to the State in 1953, through a statute commonly known as P.L. 280. *See* 18 U.S.C. § 1162; 28 U.S.C § 1360; *United States v. Brown*, 334 F. Supp. 536, 537-38 (1971). Several other states received similar transfers of jurisdiction. *Id.* But Congress reversed course in 1968 with legislation permitting any of the P.L. 280 states to "retrocede" to the federal government "all or any measure of" jurisdiction previously transferred. 25 U.S.C. § 1323.

In 1969, the State of Nebraska "retroceded" to the United States "all jurisdiction over offenses committed by or against Indians in the areas of Indian country located in Thurston County, Nebraska," with certain exceptions related to offenses involving motor vehicles. *See Brown*, 334 F. Supp. at 544-545 (reprinting statute); APP146. Interior accepted the retrocession with a legal description of "Indian country located within the boundaries of the Omaha Indian Reservation in Thurston County" that delineated the western boundary by reference to "the west boundary line of the Omaha Indian Reservation as originally surveyed." 35 Fed. Reg. 16598 (1970); APP 146. The legislature has never sought to alter Interior's delineation, even as it has considered legislation that would expand the scope of the State's retrocession to offenses involving motor vehicles. S*ee, e.g.,* Leg. Res. 234, 118th Leg., 2d Sess. (Neb. 2008).

56

Third, the Nebraska Department of Revenue, in four revenue rulings between 1976 and 1992, held that the reservation's boundaries were those established by treaty, and it specifically identified Pender as being within the reservation boundaries. *See* APP 2508 (reproducing Neb. Rev. Rul. 99-92-1); *see also* Neb. Rev. Rul. 99-90-1, RIA SLT NE NE05199004030008; Neb. Revenue Ruling 99-89-2, RIA SLT NE NE05198909120002; Neb. Rev. Rul. 99-76-6, RIA SLT NE NE05197610130011.

Fourth, while the State's claim in this case is that the Tribe's collection of motor fuel tax revenue in the disputed area exceeds tribal authority, in 2005 the State itself entered into a written agreement with the Tribe for the collection of such taxes within the Reservation, pursuant to which the State collected taxes in the disputed area. APP 2516. The State signed the agreement under statutory authority to enter into agreements with Indian tribes for collecting and disseminating taxes on sales of motor fuels made "on a federally recognized Indian reservation." Neb. Rev. Stat. § 66-741. And the agreement specified that the taxes would be collected within "the boundaries of the Reservation." APP 2520. While the agreement did not delineate the reservation boundaries, the State interpreted it as applying within the disputed area and, pursuant to the agreement, collected tribal taxes from fuel retailers in the disputed area, including within

57

Pender, and remitted those taxes to the Tribe. *See, e.g., Lamplot v. Heineman*, No. 4:06-cv-3075, Complaint (D. Neb. March 3, 2006). While the State may no longer wish to enter into such agreements with the Tribe, the fact that it has done so recently is evidence weighing against a finding of diminishment.

Fifth, various State maps have depicted the Reservation as undiminished. Specifically, State maps prepared in 1908 show the Reservation's western boundaries to include the area west of the right-of-way, coinciding with an 1866-1867 General Land Office map and survey, undiminished by the 1882 Act. *Compare* APP664-665 *with* APP 2663-2664; *see also* APP 2662 (southwestern corner and western and southern boundaries).[13] These detailed maps depict land ownership in the disputed area by name and corresponding tract, all bounded by the original reservation boundary lines. In addition, an 1889 State Board of Transportation railway map shows the Reservation extending beyond the right-of-way. APP2661. And while for many years Nebraska highway maps did not even show that the Omaha Reservation existed, maps published

---

[13] More legible versions of theses maps are available at:
ftp://ftp.sso.state.ne.us/maps/gloc/161.pdf and
ftp://ftp.sso.state.ne.us/maps/gloc/163.pdf (1866-1867 maps) and
http://www.loc.gov/resource/g4193cm.gla00166/#seq-15 and
http://www.loc.gov/resource/g4193cm.gla00166/#seq-5 (1908 maps).

Appellate Case: 14-1642    Page: 67    Date Filed: 07/08/2014 Entry ID: 4172819

from 1972 through early 2000 showed Pender and at least parts of the disputed area within the Reservation. APP2253-2254.

The Beverage Retailers argue in a footnote (Br. 57) that the diminishment of the Reservation was recognized by a Nebraska state court and a 2007 State Attorney General Opinion. All parties, however, recognize that the Nebraska state court has no authority over the question. And the Attorney General opinion simply relied on (1) that single state court case – which the State itself characterized as lacking authority in other litigation; and (2) the 1989 Field Solicitor's letter that was subsequently discredited and withdrawn.

### 3. The subsequent pattern of settlement does not support a finding of diminishment.

The district court recognized that the evidence on the demographics in the disputed area is mixed, but that no matter how strong the evidence, "it cannot overcome [the] conclusion that the language of the 1882 Act itself does not clearly evince Congress' intent to diminish the Omaha Reservation." Op. 47-48 (quoting *Duncan Energy*, 27 F.3d at 1298) (APP260-261).

The Beverage Retailers contend (Br. 51) that the fact that the population demographics for the lands west of the right-of-way have been at least 90 percent non-Indian since settlers moved into the area following

Appellate Case: 14-1642    Page: 68    Date Filed: 07/08/2014 Entry ID: 4172819

the 1882 Act supports a finding of diminishment. But the situation here significantly differs from the circumstances presented in cases concluding that a finding of diminishment was supported because an existing Indian population was displaced by settlers. Rather, in 1882, the Omaha Reservation had few if any tribal members living west of the right-of-way. APP113. Instead, the Omahas had located their villages in the eastern portion of the Reservation near the Missouri River, and used the western portion as a hunting ground, as well as a buffer and security zone to protect against attacks from other tribes. APP2193, 2198. And few Omaha Indians selected allotments in the western area, preferring to stay near their villages and the water and timber in the eastern area. APP140-141.

Nevertheless, Omaha Indians continued to have a prominent presence west of the right-of way. Many regularly visited the newly established Village of Pender, lived there, and/or conducted business there. And tribal members played prominent roles in Pender's early settlement. Between 1890 and 1895, Thomas Sloan, an attorney and member of the Omaha Tribe, maintained a residence and a law office in Pender; he also served as the Mayor of Pender, Surveyor of Thurston County, and Justice of the Peace. APP144. Hiram Chase, another attorney and tribal member, resided and practiced law in Pender, where his children attended public

Appellate Case: 14-1642    Page: 69    Date Filed: 07/08/2014 Entry ID: 4172819

schools; he also served as Thurston County Attorney for eight years, before being elected as County Judge. *Id.*

The demographics over time paint a complex picture. The 1882 Act actually resulted in an *increase* in the Indian population in the western area. Indeed, the Indian population west of the right-of-way more than quadrupled between 1900 and 1910, APP358, and the most recent census figures in the record show nearly twice as many Indians living there currently as compared to 100 years ago, while the non-Indian population declined by about half during the same period. *Id.* In fact, population figures *most* changed after the 1882 Act on the *east* side of the right-of-way. Plaintiffs cite cases finding diminishment where 66% to 92% of the population was non-Indian, but between 1910 and 1930, some 75% to 85% of those residing east of the right-of-way, *i.e.*, on lands within the undisputed Reservation, were non-Indian, undercutting any interpretive significance of the large non-Indian population percentages residing west of the right-of-way.

In sum, the subsequent treatment of the Reservation sheds no clear light on what Congress intended the 1882 Act to accomplish, and the ambiguities must be resolved in favor of the Tribe. Moreover, as this Court has held, "exclusive reliance on the third *Solem* factor to create a quasi-

61

diminishment [is] totally inappropriate." *Duncan Energy*, 27 F.3d at 1298. As such, it provides no basis for a finding of diminishment here.

### D. Confirming the validity of the Omaha Reservation boundaries will not disrupt settled expectations or cause significant changes in the disputed area.

Unable to satisfy the stringent legal standards necessary to support a finding of diminishment, Plaintiffs instead suggest that affirming the district court decision would as a practical matter have sudden and unexpected unfavorable results. Beverage Retailers Br. 33, 58. The record evidence shows that is not the case, as multiple federal and state agencies have, for many years, already treated the disputed area as being within the Reservation. Furthermore, tribal jurisdiction over non-Indians on a reservation is limited. For example, tribes have no criminal jurisdiction over non-Indians within the boundaries of a reservation unless Congress has authorized tribes to exercise it in limited circumstances.[14] *See Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978) (as discussed in *United States v. Lara*, 541 U.S. 193 (2004)). Tribes also have limited civil jurisdiction over non-Indians on non-Indian fee land within reservations.

---

[14] Congress may create specific exceptions, as it did in the Violence Against Women Act. *See* Pub. L. No. 113-4, 127 Stat. 54 (tribal jurisdiction over non-Indian defendants who commit certain domestic violence crimes against Indian victims).

62

*See Montana v. United States*, 450 U.S. 544 (1981) (tribe lacks civil regulatory jurisdiction over non-Indians on non-Indian fee land within reservation, absent certain exceptions[15]); *South Dakota v. Bourland*, 508 U.S. 679 (1993) (tribe lacks civil regulatory jurisdiction over non-Indian on reclamation land within reservation); *Plains Commerce Bank v. Long Family Land & Cattle Co., Inc.*, 554 U.S. 316 (2008) (non-Indian business sale of land to non-Indian on reservation not subject to tribal law); *Brendale v. Confederated Tribes & Bands of the Yakima Indian Nation*, 492 U.S. 408 (1989) (tribe lacks zoning jurisdiction over non-Indian in open/heavily non-Indian area of reservation); *Atkinson Trading Co. v. Shirley*, 532 U.S. 645 (2001) (tribe lacks taxation authority over non-Indian conduct on reservation under *Montana* test). Moreover, once jurisdictional boundaries are clarified, State, local, and tribal/federal agencies can work cooperatively to allocate, and where appropriate, share jurisdiction. *See, e.g.*, APP151 (describing efforts to cross-deputize state, tribal, and county police officers to facilitate law enforcement on the Reservation).

---

[15] The exceptions, as set forth in *Montana* and its progeny, are: (1) if a statute states otherwise; (2) if the non-Indian enters into a consensual relationship with the tribe; or (3) if the conduct has a direct effect on the political integrity, economic security or health or welfare of the tribe.

Appellate Case: 14-1642    Page: 72    Date Filed: 07/08/2014 Entry ID: 4172819

In any event, the question here is strictly a legal one concerning jurisdictional boundaries guaranteed by Congress. As the Supreme Court explained in *Yankton Sioux*, even though "some wish [Congress] had spoken differently, * * * [the courts] cannot remake history." 522 U.S. at 357 (quoting *DeCoteau*, 420 U.S., at 449). The 1882 statute is identical in the critical respects to other statutes found not to effect a diminishment and contains no indications that Congress intended to diminish the Reservation. To the contrary, its similarity to the 1872 statute, which indisputably did not diminish the Reservation, confirms Congress's lack of intent to diminish. The remaining record, while ambiguous in part, must be construed in favor of the Tribe and against diminishment. For all these reasons, the district court correctly held that the 1882 Act did not diminish the Omaha Reservation.

Appellate Case: 14-1642   Page: 73   Date Filed: 07/08/2014 Entry ID: 4172819

# CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

SAM HIRSCH
    Acting Assistant Attorney General

*OF COUNSEL:*

REBECCA ROSS
    Attorney, Office of the Solicitor
    U.S. Department of the Interior
    1849 C Street N.W.
    Washington, D.C. 20240

DARON CARRIERO
MARY GABRIELLE SPRAGUE
s/KATHERINE J. BARTON
    Attorneys, Environment and
    Natural Resources Division
    U.S. Department of Justice
    P.O. Box 7415
    Washington, D.C.  20044
    (202) 353-7712
    katherine.barton@usdoj.gov

JULY 2014
90-6-5-00956

Appellate Case: 14-1642   Page: 74   Date Filed: 07/08/2014 Entry ID: 4172819

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Georgia, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13, 947 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.

s/ Katherine J. Barton

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2014, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

s/ Katherine J. Barton

# ADDENDUM

1.     1885 Map of Omaha and Winnebago Reservation Lands.................. 1

2.     S. 1255, 47th Cong., 1st Sess., April 27, 1882
       (engrossed Senate bill)........................................................................ 2

3.     S. 1255, 47th Cong., 1st Sess., July 1, 1882, accompanying
       Committee Report No. 1530, reported with an amendment ............ 7

-A1-